[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 411 
This case concerns a dispute over how Pacific Enterprises Oil Company (USA) (formerly, Terra Resources, Inc.; hereinafter "Terra"[1]) should compute payment on Howell Petroleum Corporation's overriding royalty interest in oil and gas production from the Chadley 27-9 well in Fayette County, Alabama. Two issues are presented for our consideration. The first issue, an issue of apparent first impression in this State, is whether the trial court erred in holding that an Oil and Gas Board order "respacing" the land upon which Howell Petroleum's overriding royalty was computed had no effect on how Terra was contractually obligated to pay Howell Petroleum its overriding royalty. The second issue is whether an award of attorney fees pursuant to the Alabama Litigation Accountability Act (§ 12-19-270 et seq., Ala. Code 1975) was proper under the facts of this case.
 Facts
Howell Petroleum owned or controlled approximately 75% of the oil and gas leases in Section 27 (Township 14 South, Range 11 West) in Fayette County, Alabama. Terra also owned or controlled certain oil and gas leases in Section 27 and wanted to drill for oil there. Because Howell Petroleum did not desire to develop its mineral leases, Howell and Terra negotiated a "farm out" agreement.[2] In the farm out agreement, Howell agreed to assign its leases in "the unit established for [the] Earning Well" to Terra after Terra explored and drilled an earning well. In exchange for this assignment of the oil and gas leases, Howell reserved to itself an overriding royalty interest in any oil and gas produced from "the unit established for the earning well." Howell's royalty interest was 27 1/2% of the well's production before, and 40% after, "payout." "Payout" occurred when all the costs associated with drilling the well, except costs associated with drilling dry wells, were paid. The written "farm out" agreement was executed and signed by both Terra and Howell representatives in July 1986.
In September 1986, Terra applied for a drilling permit from the Oil and Gas Board for all of Section 27. Later that month, the Oil and Gas Board granted Terra's requested permit.
In October 1986, Terra executed a "Declaration of Unit" that was signed by all the working interest and royalty owners, including Howell Petroleum. The declaration established all of Section 27 as the *Page 412 
drilling or production unit. Also in October 1986, Terra drilled the Chadley 27-9 well, which, according to the farm out agreement, became the earning well. Soon thereafter, Howell assigned all its leases in Section 27 to Terra.
In December 1986, the Oil and Gas Board promulgated Order No. 86-287, which amended the special field rules for the Northeast Davis Chapel Field. Section 27 and the Chadley 27-9 well were productive extensions of the Northeast Davis Chapel Field. Order No. 86-287 allowed drilling or production units in the Northeast Davis Chapel Field to be 320-acres rather than 640 acres. Terra filed a motion asking the Board to reconsider this order, but later withdrew this request. Soon thereafter, Terra petitioned the Board for a 320-acre drilling or production unit for the Chadley 27-9 well. The Board granted Terra's petition, thus "respacing" Section 27 and creating two drilling or production units in the section: one in the eastern 1/2 and one in the western 1/2.
Based on the success of the Chadley 27-9 well, both parties apparently believed that the western 1/2 would be productive. Also, there were apparently some concerns about the leases in the western 1/2 expiring unless a well was drilled. Terra attempted to drill two wells in the western 1/2 of Section 27. Both wells were dry holes.
In January 1987, Terra executed a new "Declaration of Unit" designating the eastern 1/2 of Section 27 as the drilling or production unit for the Chadley 27-9 well. Howell Petroleum's representatives specifically refused to sign this second declaration.
In August 1987, Terra sent out division orders to its working interest, royalty, and overriding royalty interest owners. Terra computed Howell Petroleum's overriding royalty interest on a 320-acre basis, that is, on the basis of the drilling or production unit established for the eastern 1/2 of Section 27. Howell specifically protested this computation scheme in a letter dated August 25, 1987. When Terra refused to change the computation method, Howell sued.
Howell sought a judgment declaring that its overriding royalty interest should be computed on a 640-acre basis (i.e, on the original drilling or production unit designation for all of Section 27) in the future and compensation for alleged past underpayment. Also, Howell requested costs and attorney fees.
In its answer, and indeed throughout all the proceedings at the trial level, Terra contended that the Board's "respacing" of Section 27 superseded or amended its agreement with Howell as to Howell's overriding royalty. Terra argued that the Board's order creating two drilling or production units for Section 27 altered the computation for Howell Petroleum's overriding royalty based on the agreement itself. Also, or alternatively, Terra argued that the Board's "respacing" meant that royalties and overriding royalties had to be paid strictly on the two newly established drilling or production units. To do otherwise, Terra argued, would dilute the correlative rights of other interest holders in each newly established unit.
After discovery, both parties moved for summary judgment. The trial court granted a summary judgment for Howell Petroleum. Terra appealed to this Court, but then sought, and was granted, leave to file a motion for relief from judgment in the trial court.
Terra then filed a Rule 60(b), Ala.R.Civ.P., motion in the trial court based on "new matters and newly discovered evidence." Specifically, Terra noted that it had failed to cite the trial court to various cases from other jurisdictions that might be pertinent to the case. Also, Terra asserted that it had newly discovered evidence concerning Howell's knowledge of its petition for the Board to "respace" Section 27, of the Board's order, and of other pertinent matters. The trial court granted Terra's Rule 60(b) motion and set the case for trial.
After hearing the evidence, the trial court made extensive findings of fact and conclusions of law and concluded that the farm out agreement and the initial declaration of unit constituted a written contract. Further, the court found that Howell, in *Page 413 
assigning its leases in Section 27, had fulfilled its part of the bargain. Additionally, the trial court found that the declaration of unit was a voluntary pooling agreement that became an integral part of the contract. Importantly, the court held that the Board's "respacing" of Section 27 into two 320-acre drilling or production units did not change the underlying contract between Terra and Howell. The court entered a judgment awarding Howell Petroleum $90,236.18, plus interest, for past underpayment and declaring that, in the future, Terra was to compute Howell's overriding royalty payments on a 640-acre unit of measure.
In an amended judgment, the trial court found that Terra had filed the Rule 60(b) motion for relief from judgment merely to impose delay and without substantial justification. Specifically, the trial court found that Terra failed to proffer any newly discovered evidence at trial or to otherwise justify its motion for relief from judgment. The court did not award any specific amount for attorney fees before Terra appealed.
 I. The Unit of Measure Issue
Initially, Terra argues that other oil and gas producing jurisdictions hold that a valid order of the Oil and Gas Board, or those States' functional equivalents, supersedes or amends royalty or overriding royalty agreements based on a voluntary spacing or pooling declaration. Terra cites Hladik v. Lee,541 P.2d 196 (Okla. 1975), Humble Oil Refining Co. v. Jones,125 So.2d 640, (La.App. 1961), annulled and remanded, 241 La. 661,130 So.2d 408, aff'd on rehearing, 157 So.2d 110
(La.App. 1968), Fletcher v. Ricks Exploration, 905 F.2d 890 (5th Cir. 1990), and 4 Eugene Kuntz, A Treatise on the Law of Oil andGas § 48.3(k) (1990), in support of this contention.
In response, Howell Petroleum argues the distinction between spacing and pooling. Under Alabama statutes, both spacing and pooling may be either voluntary or compulsory. See, §§9-17-12(b) and 9-17-13(a), Ala. Code 1975. According to Howell, compulsory spacing, or compulsorily establishing a drilling or production unit under § 9-17-12(b), Ala. Code 1975, is merely a conservation measure that has no effect on royalty payments. Howell apparently concedes, however, that compulsory pooling, or compulsorily integrating interests into a drilling or production unit under § 9-17-13(a) does affect royalty payments.
After carefully reading the cited authorities, we conclude that "respacing" by the Board does not affect a prior royalty agreement, unless the agreement explicitly makes, or can reasonably be interpreted to make, royalty computations dependent on spacing by the Board.[3] Also, we agree *Page 414 
with Howell that compulsory or forced pooling under § 9-17-13
does affect prior royalty agreements. See, Humble Oil Refining, 125 So.2d at 646-47, aff'd on rehearing, 157 So.2d at 112.[4]
In Jones v. Bronco Oil Gas Co., 446 So.2d 611, 613 n. 3 (Ala. 1984), this Court stated:
 "In passing, we note our agreement with the view of the Supreme Court of Louisiana that the orders of the regulatory authority charged with the responsibility of preventing waste of the state's oil and gas 'supersede, supplement, replace, and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. [And,] that these orders become the law as between the parties in determining their respective rights and obligations.' Delatte v. Woods, 232 La. [341] at 357, 94 So.2d [281] at 287 (1957)."
We reaffirm our statement in Bronco Oil. However, implicitly, for a Board order to "supersede or supplement" a provision in a private contract the Board order and the contractual provision must conflict. See, Arkansas Louisiana Gas Co. v. SouthwesternNatural Production Co., 221 La. 608, 609, 60 So.2d 9, 10
(1952). We conclude that the Board order at issue here does not address royalty payments, and, thus, cannot conflict with the private contractual agreement between Terra and Howell Petroleum.
However, we agree with Terra's second argument that the agreement between it and Howell Petroleum, by its very terms, made computation of Howell's overriding royalty dependent on spacing by the Board.[5] We conclude that the trial court erred in making its legal determination that the agreement between Howell and Terra was not affected by the Board's order.
It is well settled that "two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract." Haddox v. First AlabamaBank of Montgomery, N.A., 449 So.2d 1226, 1229 (Ala. 1984). Whether an agreement is ambiguous is a legal question for the court. Terry Cove North, Inc. v. Baldwin County SewerAuthority, Inc., 480 So.2d 1171, 1173 (Ala. 1985). If an agreement is found to be unambiguous, the court then has the duty to determine the meaning of the agreement. Id. The trial court should give the terms of the agreement their clear and plain meaning. Id. Further, the court should presume that the parties intended what the terms of the agreement clearly state.Id.
We agree with the trial court that the farm out agreement, the initial unit declaration, and the assignment of leases formed a binding contract between Howell and Terra. We disagree, however, with the trial court's legal conclusion that this agreement was not affected by the Board's "respacing" order.
The farm out agreement states, in pertinent part:
"V. Assignment
 "If the Test Well, or substitute therefor, is drilled within the time and manner and to the depth specified herein, and if such well, hereinafter sometimes called the 'Earning Well,' is completed as a producer of oil and/or gas in commercial quantities, and upon Terra's written request, Howell agrees to execute and deliver an assignment to Terra, without warranty of title either express or implied, *Page 415 
of all Howell's rights, title and interest in and to the Farmout Lands subject to this agreement insofar and only insofar as such portions of the Farmout Lands are included within the geographical boundaries of the unit established for said Earning Well."
(Plaintiff's Exhibit 1 at p. 2; Supp.R. at 4; emphasis supplied.)
The Declaration of Unit states, in pertinent part:
 "WHEREAS, the undersigned, having full authority in and under the oil, gas and mineral leases described in Exhibit 'A' and embraced within the following-described unit, consider it necessary and advisable to pool, consolidate, and combine the lands covered by said leases, and in order to comply with orders prescribed by the Oil and Gas Board of Alabama and to establish as a drilling, operating and producing unit the land hereinbelow described;
 "NOW THEREFORE, in accordance with the power and authority granted by the leases described in Exhibit 'A' and in consideration of the premises, the undersigned do hereby pool, combine and consolidate the oil, gas and mineral leases and interests described in Exhibit 'A,' and the lands and acreage covered thereby so as to constitute and establish the following described lands as a drilling or production unit for the development, production and transportation of oil, gas, gas condensate and other gaseous hydrocarbons, to wit:
"TRI/Chadley 27-9
All Section 27-14S-11W
Fayette County, Alabama
 "There is hereby pooled and combined, into the area described above, all the leasehold, mineral, overriding royalty, and royalty interests and all other interests in the above-described unit as to which the undersigned (or any of the undersigned) have the right to pool and combine into the unit created hereby whether or not said leases and other interests are particularly described herein. Said unit is subject to the rules, regulations, and orders of the Oil and Gas Board of Alabama, and such pooled unit shall, unless sooner terminated by the parties hereto, remain in full force and effect until the leases described in Exhibit 'A' have terminated by their own terms and provision."
(Plaintiff's Exhibit 5 at p. 1; Supp.R. at 20; emphasis supplied.)
The basic legal question that the trial court had to answer was what was meant by "the unit established for said Earning Well." Neither party contests that the "earning well" was the Chadley 27-9. Clearly, initially the "unit established" for the Chadley 27-9 was the voluntarily created unit consisting of all 640 acres in Section 27. However, the declaration of unit clearly was made subject to "the rules, regulations, and orders of the Oil and Gas Board of Alabama." Therefore, when the Board "respaced" Section 27 and created two drilling or production units, the "unit established" for the Chadley 27-9 became the eastern 1/2 of Section 27. No other reasonable interpretation can come from the clear and plain meaning of the terms of the agreement. The trial court erred in interpreting the plain language of the agreement.
 II. The Attorney Fees Issue
After granting Terra's Rule 60(b) motion and hearing evidence from both parties, the trial court determined that Terra had filed the Rule 60(b) motion and put Howell through a trial "without substantial justification." In its amended judgment, the trial court stated:
 "The Court and parties had to go through a trial of this case because [Terra], in connection with its Rule 60(b) motion, represented that it had new matters of a material nature that should have been presented at the hearing on summary judgment, but were not. Based upon these representations, the case was reopened, and trial required. The Court noted at trial that none of the 'new matter' *Page 416 
promised in [Terra's] Rule 60(b) motion had been presented. The Court now finds and concludes, after [a] hearing on the attorney fees issues, that no material new matters were presented by [Terra] at the trial; and that trial was required on defenses and a counterclaim which were without substantial justification within the meaning of the [Litigation] Accountability Act. Thus, [Howell] is entitled to an award of attorney fees under the Accountability Act."
(Vol. 6 R. at 795.)
At the parties' mutual request, however, the trial court deferred making an award of attorney fees, and it had made no award of attorney fees before Terra appealed the judgment to this Court.
Terra argues that the trial court incorrectly determined that it acted "without substantial justification" in filing and pursuing its Rule 60(b) motion. Further, Terra argues that the trial court implicitly found merit in its Rule 60(b) motion when it granted the motion.
Ala. Code 1975, § 12-19-271(1), provides:
"The phrase 'without substantial justification,' when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that such action, claim, defense or appeal (including any motion) isfrivolous, groundless in fact or in law, or vexatious, orinterposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court."
On the other hand, Howell argues that the trial court's grant of Terra's Rule 60(b) motion should not be taken as a showing of implicit merit. Also, Howell stresses that Terra failed to prove the new claims and defenses set forth in its Rule 60(b) motion at trial, and that, therefore, the trial court correctly determined that the motion was "without substantial justification."
Our research reveals no prior cases in exactly the same posture as this one. Initially, then, we must determine what our standard of review will be.
We find the federal model under Rule 11, Fed.R.Civ.P., to be persuasive in determining our standard of appellate review. We note that the legislature, in defining "without substantial justification," used terms virtually synonymous with those Congress used in defining the certification standard[6] in Rule 11.
Viewing the two definitions side-by-side illustrates their remarkable similarity.
Rule 11, Fed.R.Civ.P., states, in pertinent part:
"The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warrantedby existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is notinterposed for any improper purpose, such as to harass or tocause unnecessary delay or needless increase in the cost oflitigation."
The certification standard was added to federal Rule 11 in 1983. See, 5A Charles Allen Wright and Arthur R. Miller,Federal Practice and Procedure § 1331 (1990). Because the legislature enacted the Litigation Accountability Act in 1987, the striking similarity of language cannot be an accident. Based on the striking similarity between the definition of "without substantial justification" and the certification standard *Page 417 
in Rule 11, we conclude that the legislature intended for the "without substantial justification" determination to serve the same purpose as the certification standard.
In Cooter Gell v. Hartmarx Corp., 496 U.S. 384, 393,110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990), the United States Supreme Court stated:
 "It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court
and thus, consistent with the Rule Enabling Act's grant of authority, streamline the administration and procedure of the federal courts. . . . Although the Rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, . . . any interpretation must give effect to the Rule's central goal of deterrence."
(Emphasis supplied.) See, also, Business Guides, Inc. v.Chromatic Communications Enter., Inc., 498 U.S. 533,111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).
If the central purpose of Rule 11 is to "deter baseless filings in district court," it stands to reason that the certification standard serves the same purpose. We conclude that the legislature intended to accomplish the same purpose through the "without substantial justification" determination. See, Robert D. Hunter, Alabama's 1987 Tort Reform Legislation, 18 Cumb.L.Rev. 281 (1988), and 5A Charles Allen Wright and Arthur R. Miller, Federal Practice and Procedure § 1335 (1990).
Because the underlying purposes of the certification standard and the "without substantial justification" determination are the same, and because the language used in each is synonymous, we look to federal case law construing Rule 11 for guidance in determining our standard of appellate review. Cooter Gell, supra, is the latest statement from the United States Supreme Court on appellate review of a district court's Rule 11 determination.
In Cooter Gell, the United States Supreme Court held that federal appellate courts should apply an "abuse of discretion" standard to all aspects of a district court's Rule 11 determination. According to the Court, this standard calls for (1) a determination that the district court did not apply an erroneous view of the law, and (2) a determination that the district court did not erroneously assess the evidence. See also, Davis v. Carl, 906 F.2d 533 (11th Cir. 1990), as an example of how the 11th Circuit Court of Appeals applies Cooter Gell.
Section 12-19-272(a), Ala. Code 1975, requires a trial court to determine that an action, claim or defense is "without substantial justification" before it can assess attorney fees against the party or attorney (or both) asserting the action, claim, or defense.[7] We conclude that this determination may be either a factual or a legal determination, depending on the grounds upon which the trial court bases its determination.
Section 12-19-271(1), Ala. Code 1975 states:
 "The phrase 'without substantial justification,' when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that such action, claim, defense or appeal (including any motion) is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court."
(Emphasis supplied.) *Page 418 
The clear terms of § 12-19-271(1) require that for an action, claim, or defense to be "without substantial justification" it must be either "frivolous," "groundless in fact," "groundless in law," "vexatious," or "interposed for any improper purpose." We conclude that the terms or phrases "frivolous," "groundless in fact," "vexatious," and "interposed for any improper purpose" require factual determinations that will be entitled to deference on appeal. See, Smith v. Smith, 551 So.2d 1024
(Ala. 1989). Thus, if a trial court determines that a party's action, claim, or defense is "without substantial justification," based on the applicability of any one of these terms or phrases, that determination will not be disturbed on appeal "unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence." Cove Creek Development Corp. v. APAC-Alabama, Inc.,588 So.2d 458, 461 (Ala. 1991).
However, we conclude that the phrase "groundless in law" clearly calls for a legal determination. Therefore, if the trial court determines that a party's action, claim, or defense is "without substantial justification" because it is "groundless in law," that determination will not be entitled to a presumption of correctness. Rather, the appellate courts of this State will test the validity of the trial court's legal conclusion.
Also, we conclude that the legislature had no intention to chill attorney creativity in making good faith arguments for changes in the law. Trial courts should be exceedingly careful in making a "without substantial justification" finding, so as not to discourage attorneys from creatively arguing for change in the law based on rational, good faith argument.
Additionally, we will require a trial court making the "without substantial justification" determination to make its determination, the ground or grounds upon which it relies, and the legal or evidentiary support for its determination, a part of the record, either by drafting a separate written order or by having these findings transcribed for the official record. This process will aid the appellate courts of this State during review.[8]
In this case, we cannot determine upon what basis, or upon what legal or evidentiary points, the trial court based its determination that Terra's asserted Rule 60(b) "new matters" were "without substantial *Page 419 
justification." Accordingly, we reverse the trial court's determination that the motion was filed "without substantial justification," and we remand the cause to the trial court for written or transcribed findings, as mandated above. Also, the trial court is instructed, should it decide on remand to make a determination that the motion was filed "without substantial justification," to set forth its reasoning, based on the factors enumerated in § 12-19-273. See, A M Grocery, Inc. v.Lopez, 567 So.2d 261 (Ala. 1990).
Based on the foregoing, we reverse the judgment of the trial court and remand this cause for action consistent with this opinion.
ISSUE I: REVERSED AND REMANDED.
ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
ISSUE II: REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS, HOUSTON and INGRAM, JJ., concur specially.
[1] Terra Resources, Inc., merged with and changed its name to Pacific Enterprises Oil Company (USA) sometime after all the pertinent events in this case. (Vol. 6 R., Trial Transcript at 126.) Because at trial the court and the attorneys referred to Pacific as Terra, and because all the pertinent documents refer to Pacific as Terra, for convenience we will refer to Pacific as Terra.
[2] A "farm out" agreement is defined as "A very common form of agreement between operators, whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it (in common or in severalty) to another operator who is desirous of drilling the tract. The assignor in such a deal may or may not retain an overriding royalty or production payment. The primary characteristic of the farm out is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." Howard Williams and Charles Meyers, Manual ofOil and Gas Terms 262 (5th ed. 1981).
[3] Terra cites Hladik in support of its contention that "respacing" by the Board supersedes prior royalty agreements between private parties. We find Hladik distinguishable in that the leases involved in Hladik contained provisions that made royalty computations dependent on spacing by the Oklahoma Corporate Commission (the functional equivalent of Alabama's Oil and Gas Board).
In Hladik, an oil and gas lessee voluntarily pooled numerous oil and gas leases and created a voluntarily declared 480-acre drilling or production unit. Id. at 197. The Corporate Commission then ordered that all drilling or production units within the field consist of 160 acres. Id.
Importantly, each lease involved in Hladik provided that each lessor "[would] receive only such proportion of royalty stipulated in [the] lease as lessor's acreage in [the] unit [bore] to [the] total acreage in [the] unit." Id. Also, the Corporate Commission's order specifically provided:
 " 'That all royalty interest within any spacing unit created herein shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit.' "
Id. at 197.
The Oklahoma Supreme Court concluded that the Corporate Commission's drilling or production unit superseded the voluntarily declared drilling or production unit. Id. at 199. The Court held that, pursuant to the royalty provisions in the leases and the intent implied by those provisions, royalty payments were properly made on the basis of the Commission's 160-acre drilling or production unit. Id.
[4] Humble Oil can be read as holding that an order of the Commissioner of Conservation compulsorily pooling leases into a drilling or production unit supersedes a voluntarily established unit and amends prior royalty agreements, unless the parties established "a specific and positive intention to freeze the old [voluntarily created] unit." 125 So.2d at 646.
[5] We note that Howell makes much of the asserted fact that Terra pays itself based on a 640-acre unit of measure while paying Howell based on a 320-acre unit. Our review of the record reveals that this assertion mischaracterizes the facts. (See, Vol. 7 R.; Trial Transcript at 245-57, 255-56, 317, 330-32.)
[6] See, 5A Charles Allen Wright and Arthur R. Miller, FederalPractice and Procedure § 1335 (1990) (Professors Wright and Miller use the term "standard of certification" to refer to the fifth sentence in Rule 11).
[7] Section 12-19-272(a), Ala. Code 1975 states:
 "Except as otherwise provided in this article, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorneys' fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, or interposed a defense, that a court determines to be without substantial justification, either in whole or in part."
(Emphasis supplied.)
[8] Justice Adams has obtained proposed amendments to Federal Rule 11, which, if approved by the United States Supreme Court and adopted by the Congress, will make substantial changes in that rule. In his special concurrence, Justice Adams includes the full text of those proposed amendments "for the benefit of the bench and bar." Also, he says:
 "Inasmuch as the majority opinion is based on Rule 11, the federal counterpart of the Litigation Accountability Act, it will bode well for us to take into consideration how the federal system will probably handle Rule 11 in the future. Even if the United States Supreme Court and Congress do not adopt all these changes, it is my opinion that these changes are good and should be considered by our courts in the implementation of our Litigation Accountability Act, which, to some extent, parallels Rule 11."
Opinion at 420.
I have examined the proposed amendments and comments. It is my personal opinion that the requirements placed on trial judges in imposing sanctions under the Alabama Litigation Accountability Act, as interpreted in Part II of this opinion, are just as stringent as, if not more stringent than, those placed on federal judges by the proposed amendments to federal Rule 11.
Furthermore, I do not believe that Alabama judges have used or will use the provisions of the Litigation Accountability Act to chill attorney creativity or to deny a party an opportunity to present a meritorious claim or defense. Part II of this opinion cautions trial judges to be "exceedingly careful" in imposing sanctions.
I have always believed that there is some merit in having Alabama civil procedure substantially parallel the procedure in the federal courts. As I see it, the legislature intended the Litigation Accountability Act to accomplish the same goals as federal Rule 11. The Litigation Accountability Act, as interpreted in Part II of this opinion, already contains as many safeguards against sanctions as do the proposed amendments to federal Rule 11, or perhaps more, especially insofar as appellate review is concerned.
Justice Adams discusses what has happened in the federal system and what is being proposed to correct it. I do not believe that abuse of the same kind or to the same degree is occurring or will occur in Alabama, and I believe that the safeguards of the Litigation Accountability Act are as good as, if not better than, those proposed for the federal system.
I see no need to say that we should adopt the federal amendments. Our interpretation of the Act accomplishes the same goals and more.