[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1186 
On January 18, 1995, ISS Diversified Services Company ("ISS Diversified"), an Alabama partnership owning and operating a waste collection business in the Dothan and Huntsville areas, sued Allen J. Massey, Ronnie Knotts, and Mark Dunning Industries ("MDI"), alleging violations of nonsolicitation agreements, misappropriation of trade secrets, and tortious interference with business relationships; Knotts counterclaimed for unpaid vacation pay. Massey and Knotts were former employees of ISS Diversified; MDI was their new employer. On January 20, 1995, Alabama Motor Express, Inc. ("Alabama Motor"), and several other customers of ISS Diversified sued ISS Diversified and ISS International Service Systems, Inc. ("ISS International"), an affiliated corporation, seeking a judgment declaring that their agreements with ISS Diversified and ISS International (hereinafter collectively referred to as "ISS") were void for breach of the non-assignment clause contained therein.
The trial court consolidated the cases. After a one-day bench trial, the trial court entered a judgment in favor of MDI, Massey, Knotts, and Alabama Motor; ISS appeals.
Before December 31, 1994, ISS operated a full-service cleaning, maintenance, landscaping, and waste collection business. This appeal concerns, in part, the service agreements entered into by ISS and its customers. These agreements contained the following provision: "ASSIGNMENT: Neither party shall assign this Service Agreement without the prior written consent of the other party, except that the Company, without Customer's consent may assign this Agreement to any Corporation affiliated with Company."
While they were ISS employees, Knotts and Massey signed nonsolicitation agreements as a condition of their continued employment. The agreement provided that if they left the employ of ISS and began working for one of its competitors, they could not for a one-year period solicit customers that ISS had served during their employment.
In early November 1994, Knotts and Massey learned that City Environmental Services, Inc. ("City"), wanted to buy certain ISS assets. Massey and Knotts met with MDI and made arrangements to become its employees. On December 16, 1994, ISS and City entered into a preliminary agreement whereby ISS was to sell and City was to purchase all assets related to ISS's waste collection business. Knotts and Massey ended their employment with ISS on December 17, 1994, and began working for MDI on December 19, 1994. Knotts and Massey began soliciting business from former ISS customers for MDI.
On December 31, 1994, ISS sold certain assets to City. The sales contract provided in part:
 "1. Sale of Assets. At closing . . . Seller shall sell, assign, convey, transfer and deliver to Purchaser . . . [certain assets]. . . . The Assets shall include (without limitation) all of the following:
". . . .
 "B. Customer Contracts, Customer Lists and Purchase Orders. Seller's rights in, to and under any and all customer contracts, purchase orders and/or any other purchase, service and/or other *Page 1187 
form of customer or client contracts with respect to the Business, which are assignable to Purchaser (collectively, the 'Customer Contracts'). Any customer contracts which Purchaser has notified Seller are not acceptable to Purchaser or not assignable to Purchaser shall remain the responsibility of Seller."
At the time of, or following, the date of the sale, ISS and City executed a document whereby ISS allegedly subcontracted to City its obligations under the service agreements at issue.
When ISS learned of Knotts and Massey's breaches of the nonsolicitation agreements, it sent a cease and desist letter to them and MDI. Massey, Knotts, and MDI continued their conduct, and ISS sued. Two days later, Alabama Motor sued for a judgment declaring that the service agreements transferred by ISS to City were unenforceable.
The trial court held: (1) that the customer service agreements were voidable at the option of the customer; (2) that Massey and Knotts did not violate the nonsolicitation agreements; (3) that Massey, Knotts, and MDI had not tortiously interfered with ISS's business relationships; and (4) that Knotts was entitled to $1,200 on his counterclaim for unpaid vacation pay. In addition, the trial court awarded Alabama Motor its attorney fees and costs. ISS appealed to our supreme court which, for lack of proper jurisdiction, transferred the cases to this court, pursuant to § 12-1-4, Ala. Code 1975.
ISS contends on appeal: (1) that the sale of all assets relating to its waste collection business did not constitute an assignment of the service agreements between it and its customers; (2) that the trial court erred in refusing to enforce the nonsolicitation agreements between ISS and its former employees; (3) that the trial court erred in awarding $1,200 to Knotts on his claim for unpaid vacation pay because, it says, he failed to give proper notice of his resignation; and (4) that the trial court erred in awarding attorney fees to Alabama Motor. The parties orally argued these issues before this court on January 23, 1996.
 Customer Service Agreements
It is the duty of a trial court to analyze and determine the meaning of a contract when its terms are clear; but, when the meaning or language of a contract is doubtful or ambiguous, a trial court may examine evidence other than the contract itself. Underwood v. South Central Bell Telephone Co.,590 So.2d 170 (Ala. 1991). Further, when evidence of the contracting parties' intent is in dispute, a question of fact arises for the factfinder, and its findings are presumed to be correct unless plainly erroneous or manifestly unjust. Fouts v.Beall, 518 So.2d 1236 (Ala. 1987).
We must first review the trial court's determinations regarding the contracts between ISS and its customers. The trial court initially determined that the service agreements at issue were assignable. In each of these agreements, the assignment clause is clear and unambiguous. The clause clearly states that the service agreement is assignable if the party seeking to assign it obtains the other party's consent. Because the assignment clause is clear and unambiguous with respect to the assignability of the agreements, there was no room for construction by the trial court in regard to this issue. SeeKinnon v. Universal Underwriters Ins. Co., 418 So.2d 887 (Ala. 1982). We also note that there is no statutory provision prohibiting the assignment of a contract of this nature. See, e.g., § 8-5-21, Ala. Code 1975. Accordingly, the trial court correctly concluded that the service agreements were assignable.
The trial court's second determination regarding the contracts between ISS and its customers concerned the circumstances under which ISS could sell the service agreements. No provision in the service agreements speaks directly to the issue of a sale. In fact, the only provision that deals with a transfer of any kind is the assignment clause. Because the assignment clause does not clearly and unambiguously address the possibility of a sale, the trial court must have determined that the provision or the entire agreement was unclear and ambiguous as to this point. SeeSouthern Cafeteria Operating Co. v. Eley, 52 Ala. App. 656,296 So.2d 743 (Ala.Civ.App. 1974). After making this *Page 1188 
determination, the trial court correctly examined extrinsic evidence concerning the intent of ISS and its customers. SeeFouts, supra. The evidence revealed that the parties, upon entering into the agreements, intended: (1) that only ISS would handle the customer's waste disposal needs, unless the customer consented to a change; and (2) that the customer could not transfer the agreement to another, unless ISS consented to the change. Based upon the evidence, the trial court found that the parties intended the consent requirement to apply not only to assignments but also to sales of the agreements, stating:
 "A technical reading of the provision might result in one saying a sale is not an assignment, hence there is no requirement for consent of the customer. This cannot be; if an assignment requires consent, surely a sale does. It is the substitution of parties which is important."
We cannot say that this determination was plainly erroneous or manifestly unjust.
We must now examine the trial court's determination regarding the contract between ISS and City and that contract's effect upon the service agreements at issue. The trial court, relying upon the clear and unambiguous terms of the sales agreement, found that ISS had sold these agreements to City. The terms of the sales agreement clearly state that City contracted for the purchase of "all customer contracts . . . which areassignable." (Emphasis added.) As previously discussed, the trial court correctly determined that the service agreements were assignable; as a result, they fall within the description of assets that City contracted to purchase and ISS contracted to sell. Therefore, ISS sold the service agreements to City the day the transaction closed — December 31, 1995. Because the service agreements could not be sold without the customer's consent and ISS did not have that consent, ISS breached the service agreements. The customers, therefore, were entitled to appropriate relief.
ISS argues that the trial court erred, because, it says: (1) the sales agreement expressly exempted from the sale all non-assignable contracts, which includes the service agreements; and (2) all of the service agreements were subcontracted to City rather than being assigned or sold. It further argues that if there was an assignment in violation of the service agreements, the trial court erred in holding that the service agreements were automatically void. We have addressed ISS's first argument; its remaining arguments, however, warrant further attention.
ISS argues that the closing documents and the subcontract agreement were executed at the same time and concern the same subject matter and, therefore, should be construed as one contract. Separate instruments, executed at the same time and as parts of the same transaction, with the intent to accomplish the same general object, will be read and construed as if one in form. See Evans v. Kilgore, 246 Ala. 647, 21 So.2d 842
(1945); Pacific Enterprises Oil Co. v. Howell Petroleum Corp.,614 So.2d 409 (Ala. 1993).
At trial, Alabama Motor raised the issues whether ISS and City had entered into the alleged subcontract at the time the sale took place and whether the alleged subcontract was simply an attempt to circumvent the service agreement's consent requirement. Alabama Motor presented evidence (1) that the alleged subcontract agreement was not dated or witnessed as were the other closing documents; and (2) that, immediately following the sale, City renegotiated the majority of the service agreements allegedly subcontracted to it. In response, a City official testified (1) that City and ISS executed the alleged subcontract at the same time as the other closing documents and (2) that renegotiation was a customary practice when City purchased another waste collection company. The trial court found that the alleged subcontract was merely a pretext intended to circumvent the consent requirement in the service agreements. We cannot say that there was insufficient evidence to support the trial court's finding. The evidence demonstrated that ISS and City might not have intended the alleged subcontract to be a part of the contract for sale.
ISS also argues that the trial court incorrectly held the service agreements at issue to be automatically void, relying upon Restatement *Page 1189 (Second) of Contracts, § 322(2)(b) (1981), which states that an assignor is liable for damages when an assignment violates the provisions of a contract. We note that the trial court did not hold that the service agreements were automatically void; rather, it held that the agreements were "voidable at the option of the customer." Further, the transfer at issue in this case was not an assignment; it was a sale. Thus, § 322(2)(b) of the Restatement does not apply.
 Nonsolicitation Agreements
A court will hold a nonsolicitation agreement or covenant not to compete valid and enforceable when: (1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship on the employee. Birmingham Television Corp. v. DeRamus, 502 So.2d 761
(Ala.Civ.App. 1986). These agreements must be mutually binding and provide adequate consideration. Stokes v. Moore,262 Ala. 59, 77 So.2d 331 (1955). The test for mutuality is to be applied at the time when the agreement is sought to be enforced, not when the agreement is made. Daughtry v. CapitalGas Co., 285 Ala. 89, 92, 229 So.2d 480 (1969). Under §8-1-1(b), Ala. Code 1975, the employer may enforce a nonsolicitation agreement against an employee only so long as the employer carries on a like business. Further, the party seeking to enforce the agreement has the burden of showing that it is not void. Construction Materials, Ltd. v. KirkpatrickConcrete, Inc., 631 So.2d 1006 (Ala. 1994).
ISS contends that the trial court erred in refusing to enforce the nonsolicitation agreements, arguing that the agreements should be upheld, because, it says: (1) they are properly restricted as to territory, time, and persons and are properly supported by sufficient consideration; (2) enforcement would not impose any undue hardship; and (3) ISS had a protectable interest.
The trial court found: (1) that ISS no longer carried on a like business, as required by § 8-1-1(b), Ala. Code 1975; (2) that ISS's failure to carry on a like business meant there could be no mutuality at the time it sought to enforce the agreements; and (3) that it would be unduly burdensome on Massey and Knotts to enforce the agreements. A review of the record reveals that, at the time ISS sought to enforce the agreements, the company's operations had ceased. ISS had sold all of its customer contracts, had abandoned the waste removal business, and no longer employed a staff in Massey and Knotts's departments. This fact alone is sufficient to affirm the trial court's holding in regard to this issue.
 Unpaid Vacation Pay
The trial court stated in its order that ISS's company policy concerning the interplay between resignation and the receipt of unpaid vacation pay was not applicable because ISS had been sold and its employees terminated. ISS contends that, because the policy was in effect when Knotts resigned and because he failed to give the required two weeks' notice, the trial court erred when it awarded Knotts $1200 in unpaid vacation pay.
We agree with ISS. The company policy clearly states that an employee who fails to provide two weeks' written notice before resigning forfeits any accrued vacation pay. Knotts resigned from ISS, without giving notice, on or before December 17, 1994. The sale of ISS's assets occurred on December 31, 1994; therefore, the policy remained in effect for at least two weeks following Knotts's resignation. The trial court's holding in regard to the unpaid vacation pay is not supported by the evidence or by reasonable inferences drawn therefrom and is therefore incorrect. Accordingly, that portion of the trial court's judgment is reversed, and the case is remanded for the trial court to enter an order consistent with this opinion.
 Attorney Fees
An award of attorney fees, where permissible, is a matter within the discretion of the trial court and will not be reversed on appeal absent a showing that the trial court abused its discretion. Bannister v. Eubanks, 575 So.2d 563, 567 (Ala. 1991). In addition, *Page 1190 
attorney fees may be awarded "only when 'authorized by statute, when provided in a contract, or by special equity.' "Mitchell v. Huntsville Hospital, 598 So.2d 1358, 1360 (Ala. 1992) (citations omitted). Because this case involves neither a statutory nor a contractual authorization, the only basis for an award would be the "special equity" exception. This exception ordinarily applies when fraud, willful negligence, or malice has been practiced or the attorney's efforts create a fund out of which the fees may be paid. Id.; Reynolds v. FirstAlabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala. 1985). After reviewing the record, we hold that the "special equity" exception is inapplicable, and that the trial court abused its discretion in awarding attorney fees. The award of attorney fees is reversed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, MONROE, and CRAWLEY, JJ., concur.