824 So.2d 693 (2001)
Karen OLIVER
v.
Dr. Bryan WOODWARD III.
1990641.
Supreme Court of Alabama.
December 14, 2001.
*694 G. Whit Drake and Elizabeth H. Shaw of Drake & Shaw, Birmingham, for appellant.
Crawford S. McGivaren, Jr., and Melanie M. Bass of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for appellee.

On Application for Rehearing
JOHNSTONE, Justice.
The opinion of September 28, 2001, is withdrawn and the following is substituted therefor.
Karen Oliver appeals the summary judgment entered in favor of Dr. Bryan Woodward III. We reverse and remand.
On March 23, 1995, suffering from bilateral pneumonia, Karen Oliver was admitted to the intensive care unit of Medical Center East, Inc. (MCE). On March 25, 1995, at the direction of Oliver's treating physician, Dr. Greg Sullivan, an anaesthesiologist Dr. Barry Martin inserted a central venous catheter into a vein on the left side of Oliver's neck for the purpose of infusing medications and fluids. Dr. Martin ordered a chest X-ray to verify the placement of the central venous catheter. Because no radiologist was available, an emergency-room doctor, following hospital policy, read Oliver's X-ray to verify placement of the catheter. The emergency-room doctor verified placement of the catheter. In Oliver's medical chart, Oliver's nurse noted that an emergency-room doctor had cleared the central venous catheter for use. The nurse did not note the name of the emergency-room doctor or note the time that the emergency-room doctor cleared the catheter for use. Later that night, Dr. Suzanne Vaughan, a radiologist, read Oliver's X-ray and noted that the catheter "is a little more to the left than is usually seen in when it is in the superior vena cava." The next day, Oliver developed thrombosis in her right arm, and the thrombosis eventually required the amputation of Oliver's right arm below the elbow.
The material procedural facts follow.
(1) On October 29, 1996, Oliver sued Dr. Martin and various fictitious defendants for medical malpractice arising out of the improper placement of a central venous catheter into to her aorta. She alleged the improper placement of the central venous catheter and the delay in *695 diagnosing the improper placement of the central venous catheter caused a thrombosis in her right arm which resulted in the surgical amputation of her right arm below the elbow. Oliver sued the fictitious defendants for, among other breaches of duty, failing to monitor the catheter for "malposition."
(2) On February 17, 1997, Oliver deposed Dr. Martin, who stated that he relied on the radiologist, Dr. Suzanne Vaughan, and the nurses of MCE to tell him if there was a problem with the placement of the central venous catheter.
(3) On February 26, 1997, Oliver amended her complaint to add as defendants MCE, Anesthesia Group East, P.C., Dr. Suzanne Vaughan, and Birmingham Radiological Group-MCE, P.C. On that same day, Oliver propounded interrogatories to MCE. One of the interrogatories requested the name and address of "each person believed or understood to have any information concerning the X-ray, X-ray report, or any other information concerning X-rays taken by this defendant and/or its employees on or about March 25, 1995 of Karen Oliver regarding the verification of the placement of a central venous catheter."
(4) On April 10, 1997, Oliver's lawyer sent the MCE lawyer a letter requesting that MCE answer the outstanding discovery requests.
(5) On April 25, 1997, Oliver's lawyer sent the MCE lawyer a second letter requesting that MCE answer the outstanding discovery requests.
(6) On May 28, 1997, Oliver's lawyer sent the MCE lawyer a third letter requesting that MCE respond to the outstanding discovery requests.
(7) On June 25, 1997, MCE filed answers and objections to Oliver's interrogatories.
(8) On July 22, 1997, Oliver's lawyer sent the MCE lawyer a letter requesting dates and times to depose Nurse Renee Brantley.
(9) On October 1, 1997, Oliver's lawyer sent the MCE lawyer a second letter requesting dates and times to depose Nurse Brantley.
(10) On November 10, 1997, Oliver's lawyer sent the MCE lawyer a third letter requesting dates and times to depose Nurse Brantley.
(11) On December 16, 1997, Oliver's lawyer sent the MCE lawyer a fourth letter requesting dates and times to depose Nurse Brantley.
(12) On January 6, 1998, Oliver's lawyer sent the MCE lawyer a fifth letter requesting dates and times to depose Nurse Brantley.
(13) On March 10, 1998, Oliver's lawyer sent the MCE lawyer a sixth letter requesting dates and times to depose Nurse Brantley.
(14) On April 13, 1998, Oliver's lawyer sent the MCE lawyer a seventh letter requesting dates and times to depose Nurse Brantley.
(15) On May 19, 1998, Oliver's lawyer sent the MCE lawyer an eighth letter requesting dates and times to depose Nurse Brantley.
(16) On June 30, 1998, Oliver's lawyer deposed Nurse Brantley, who denied any knowledge of the identity of the emergency room doctor who read Oliver's X-ray to determine whether the catheter was properly placed.
(17) On July 2, 1998, Oliver's lawyer propounded a second set of interrogatories to MCE. One of the interrogatories requested the identity of the emergency-room *696 doctors who worked in the emergency room on the day that Oliver's catheter was inserted.
(18) On August 25, 1998, Oliver's lawyer sent the MCE lawyer a letter requesting that MCE respond to the second set of interrogatories.
(19) On August 31, 1998, Oliver moved to compel MCE to answer the second set of interrogatories.
(20) On September 3, 1998, Oliver's lawyer sent a letter and notices of depositions to MCE's lawyer. Oliver noticed the depositions of MCE X-ray technicians who might know the identity of the emergency-room doctor who read Oliver's X-ray to verify the placement of the catheter.
(21) On September 10, 1998, MCE answered Oliver's second set of interrogatories. MCE identified Dr. John Michlin, Dr. David Willis, Dr. Robert Pepper, and Dr. Bryan Woodward III as emergency room doctors on duty between 12:01 a.m. and 3:00 p.m. on March 25, 1995. In response to the interrogatory requesting the identity of the emergency-room doctor who verified the placement of Oliver's central venous catheter, MCE responded, "Unknown."

(22) On September 23, 1998, Oliver moved to compel MCE to produce a certified copy of Oliver's medical records.
(23) On November 2, 1998, Oliver deposed Anita Cornelius, an MCE radiographer, who denied any knowledge of the identity of the emergency-room doctor who read Oliver's X-ray on March 25, 1995.
(24) On November 5, 1998, Oliver's lawyer sent the MCE lawyer a letter requesting dates and time to depose Dr. Willis, one of the emergency-room doctors.
(25) On November 25, 1998, MCE identified Dr. Pepper and Dr. Woodward as the emergency-room doctors on duty between 8:00 a.m. and 12:00 noon on March 25, 1995.

(26) On December 15, 1998, Oliver's lawyer sent the MCE lawyer a second letter requesting dates and time to depose Dr. Willis.
(27) On January 25, 1999, Oliver's lawyer sent the MCE lawyer a third letter requesting dates and times to depose Dr. Willis.
(28) On February 10, 1999, Oliver's lawyer sent the MCE lawyer a letter requesting dates and times to depose Elisa Byrd, an MCE radiographer.
(29) On March 17, 1999, Oliver deposed Dr. Michlin, another of the emergency-room doctors identified by MCE. Dr. Michlin denied being the emergency-room doctor who verified the placement of Oliver's central venous catheter.
(30) On March 31, 1999, Oliver's lawyer sent the MCE lawyer a second letter requesting dates and times to depose Elisa Byrd.
(31) On April 8, 1999, Oliver deposed Dr. Willis, who denied being the emergency-room doctor who verified the placement of Oliver's central venous catheter.
(32) On April 15, 1999, Oliver deposed Dr. Woodward, who denied being the emergency-room doctor who verified placement of Oliver's cental venous catheter.

(33) On April 28, 1999, Oliver deposed Elisa Byrd, who testified that she handed Oliver's X-ray to Dr. Woodward to verify placement of Oliver's central venous catheter.

(34) On April 29, 1999, Oliver substituted Dr. Woodward for fictitious defendants 2, 6, 7, 10, and 16.

*697 (35) On May 3, 1999, Oliver moved for sanctions against MCE for failing to supplement its answers to interrogatories to identify Dr. Woodward as the emergency-room doctor who read Oliver's X-ray to verify placement of her central venous catheter.
(36) On May 5, 1999, MCE, responding to Oliver's motion for sanctions, stated, among other assertions, that MCE's lawyer did not learn until April 5, 1999, that Elisa Byrd knew the identity of the emergency-room doctor who read Oliver's X-ray to verify the placement of the central venous catheter.
(37) On September 3, 1999, Dr. Woodward moved for a summary judgment on the ground that the statute of limitations had run before Oliver substituted Dr. Woodward for the fictitious defendants.
(38) On October 21, 1999, the trial court entered a "nonfinal" summary judgment in favor of Dr. Woodward. The case proceeded to trial against the remaining defendants. The summary judgment in favor of Dr. Woodward became final and appealable on November 17, 1999, when the trial court entered judgment on the verdict of the jury. Rule 56(d), Ala. R. Civ. P.
Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., and Dobbs v. Shelby County Econ. & Indus. Dev. Auth., 749 So.2d 425 (Ala.1999). The court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party. System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419 (Ala.1996). In reviewing a summary judgment, an appellate court, de novo, applies the same standard as the trial court. Dobbs, supra.
Oliver contends that, because at the time she filed her original complaint she was ignorant of Dr. Woodward's identity and his involvement in her treatment, her substitution of Dr. Woodward for various fictitious defendants relates back to the filing of her complaint. Dr. Woodward contends that (1) Oliver's claims against him are barred by the statute of limitations, because Oliver did not sue Dr. Woodward within four years of the act or omission, and (2) Oliver's substitution of Dr. Woodward for the fictitious defendants does not relate back to the original filing, because she knew of Dr. Woodward's identity before the two-year statute of limitations and the four-year statute of repose had run.
In Marsh v. Wenzel, 732 So.2d 985 (Ala.1998), we addressed the applicability of the doctrine of relation back in a medical-malpractice case:
"Dr. Wenzel and the Laboratory contend that the rule of repose in § 6-5-482 allowing four years for the filing of a medical-liability action prohibits the application of the doctrine of relation back that normally is available pursuant to Rule 15(c)(4), Ala. R. Civ. P., when a plaintiff commences an action by suing both named and fictitious defendants. The trial court concluded that Marsh's amended complaint was barred by the rule of repose because it was filed more than four years after the act or omission that gave rise to Marsh's cause of action against Dr. Wenzel and the Laboratory for medical negligence. We disagree with that conclusion. The purpose of the doctrine of relation back is to provide a plaintiff a mechanism for giving vitality to a later filing as if it had been made at the time of the initial action. Section 6-5-482 speaks of the commencement of an action as the necessary operative event. It does not expressly exclude the availability of fictitious-party *698 practice and its doctrine of relation back. Once the plaintiff complies with Rule 9(h), Ala. R. Civ. P., in an action that otherwise is timely filed, the doctrine of relation back, set out in Rule 15(c)(4), permits the plaintiff to satisfy the prerequisite that the action `be commenced' as set forth in § 6-5-482.
"Because § 6-5-482 does not provide an absolute bar to Marsh's action against Dr. Wenzel and the Laboratory, we must determine whether Marsh satisfied the requirements of Rule 9(h) so as to entitle her to the benefits of the doctrine of relation back. The trial court concluded that she did not satisfy those requirements. Rule 9(h) provides:
"`Fictitious Parties. When a party is ignorant of the name of an opposing party and so alleges in the party's pleading, the opposing party may be designated by any name, and when that party's true name is discovered, the process and all pleadings in the action may be amended by substituting the true name.'"
732 So.2d at 987-88. This Court has further held:
"The requirement that the plaintiff be ignorant of the identity of the fictitiously named party has been generally explained as follows: `The correct test is whether the plaintiff knew, or should have known, or was on notice, that the substituted defendants were in fact the parties described fictitiously.' Davis v. Mims, 510 So.2d 227, 229 (Ala.1987). This Court has elaborated upon the requirement that the plaintiff be ignorant of the identity of the fictitiously named party by holding that the plaintiff must substitute the named defendant for the fictitious party within a reasonable time after determining the defendant's true identity, see Walden v. Mineral Equip. Co., 406 So.2d 385 (Ala.1981), and by holding that `the same policy considerations which require a plaintiff to amend his complaint within a reasonable time after learning the defendant's true identity also require the plaintiff to proceed in a reasonably diligent manner in determining the true identity of the defendant.' Kinard v. C.A. Kelly & Co., 468 So.2d 133, 135 (Ala.1985). The determination of whether a plaintiff amended the complaint within a reasonable time may include inquiry into whether the plaintiff's delay unduly prejudiced the substituted defendant. See Wallace v. Doege, 484 So.2d 404 (Ala.1986); Denney v. Serio, 446 So.2d 7 (Ala.1984); Peek v. Merit Machinery Co., 456 So.2d 1086 (Ala.1984)." (Emphasis added.)
Crawford v. Sundback, 678 So.2d 1057, 1060 (Ala.1996).
It is undisputed that Oliver was ignorant of Dr. Woodward's identity at the time she filed her original complaint. It is also undisputed that Oliver's complaint stated causes of actions against various fictitious defendants named in her complaint. The issue before this Court is when Oliver knew or should have known Dr. Woodward's identity as a tortfeasor "described fictitiously" in the complaint. Marsh, supra. Dr. Woodward claims that Oliver knew his identity on November 25, 1998, when MCE identified Drs. Pepper and Woodward as emergency-room doctors on duty between 8:00 a.m. and 3:00 p.m. on March 25, 1995. Oliver asserts that she did not know Dr. Woodward's identity as the emergency-room doctor who read Oliver's X-ray until April 28, 1999, when Elisa Byrd identified Dr. Woodward as the emergency-room doctor who read Oliver's X-ray and verified placement of Oliver's central venous catheter. We agree with Oliver.
Although on November 25, 1998, MCE identified Dr. Woodward as an emergency-room *699 doctor on duty on March 25, 1995, MCE did not identify Dr. Woodward as the emergency-room doctor who read Oliver's X-ray and who verified the placement of Oliver's central venous catheter. Oliver diligently and reasonably began serially deposing the four doctors identified as working in the emergency room on March 25, 1995. Three of the four doctors, including Dr. Woodward, denied being the emergency-room doctor who read Oliver's X-ray. Not until Oliver deposed Elisa Byrd did Oliver have any notice that Dr. Woodward was the emergency-room doctor responsible for verifying placement of her central venous catheter.
Although Dr. Woodward argues that Oliver should have sued him and the other emergency-room doctor as soon as they were identified by MCE in November 1998, substitution of Dr. Woodward and the other emergency-room doctor for fictitious defendants without a reasonable factual basis or a substantial justification for the substitution would have subjected Oliver to sanctions under Rule 11, Ala. R. Civ. P., and the Alabama Litigation Accountability Act, § 12-19-270 et seq., Ala. Code 1975. § 12-19-272, and Pacific Enters. Oil Co. v. Howell Petroleum Corp., 614 So.2d 409, 418 (Ala.1993). See also DeSisto College, Inc. v. Line, 888 F.2d 755 (11th Cir.1989), and Plus Int'l, Inc. v. Pace, 689 So.2d 160 (Ala.Civ.App.1996).
We conclude that Oliver sued Dr. Woodward within a reasonable time, one day, after learning his true identity as the fictitiously-named doctor who read her March 25, 1995 X-ray and verified placement of central venous catheter. Thus, the doctrine of relation back applies to Oliver's complaint and to her substitution of Dr. Woodward. Consequently, Oliver sued Dr. Woodward within the two-year statute of limitations and the four-year statute of repose.
Therefore, the trial court erred in entering summary judgment in favor of Dr. Woodward. We reverse the summary judgment and remand this cause for further proceedings.
APPLICATION OVERRULED; OPINION OF SEPTEMBER 28, 2001, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
SEE, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON and LYONS, JJ., concur specially.
MOORE, C.J., concurs in the result.
HOUSTON, Justice (concurring specially).
I do not believe Karen Oliver failed to use due diligence in attempting to discover Dr. Bryan Woodward III's identity, as a matter of law. I believe that the question whether she proceeded with due diligence must be determined by the trier of the facts.
LYONS, Justice (concurring specially).
I concur in the main opinion's rejection, on the authority of Marsh v. Wenzel, 732 So.2d 985 (Ala.1998), of Dr. Woodward's defense grounded upon the rule of repose set forth in § 6-5-482, Ala.Code 1975. I also concur in the main opinion's rejection of Dr. Woodward's contention that Oliver failed to use due diligence in ascertaining his identity and that, therefore, the amendment to the complaint adding him as a defendant should not relate back to the original date of filing. I concur specially to address further Dr. Woodward's contentions regarding the rule of repose and Oliver's alleged lack of due diligence.
Dr. Woodward contends that the amendment to the complaint adding him as a defendant should not relate back to the *700 original date of filing because Oliver was allegedly unable to demonstrate the requisite ignorance of identity before the expiration of the limitations period, as required by Rule 9(h), Ala. R. Civ. P. This Court in Marsh v. Wenzel, 732 So.2d at 989, defined ignorance of identity in terms of "ignorance of the existence of a relationship that could give rise to a duty." In Wenzel, only one pathologist was involved in the treatment of the plaintiff, and his name appeared on the records generated as of the time of treatment. Here, the identity of the emergency-room physician who read Oliver's X-ray and verified placement of the central venous catheter was unclear when the action was filed. Applying the rule in Wenzel, I conclude that Oliver did not have sufficient knowledge of the existence of a legal relationship that could give rise to a duty to her, and her amendment should not be denied the benefit of relation back to the filing of the complaint on the basis that she lacked the requisite ignorance of identity.
With respect to Woodward's claim that Oliver did not exercise due diligence in amending her complaint, this Court observed in Wenzel, in the context of whether to use a defendant's real name or to use fictitious parties in filing a lawsuit:
"Counsel's obligation to act in good faith and to act consistently with high ethical standards requires that counsel strike a balance between, on the one hand, the obligation to present, within the period of limitations, the full range of claims essential to protect the interests of a plaintiff, and, on the other hand, the competing obligation to refrain from bringing groundless or frivolous claims."
732 So.2d at 990. The same policy considerations ought to govern amendments pursuant to Rule 9(h), substituting a named party for one sued only by a fictitious name. I therefore cannot fault Oliver for failing to sue both Dr. Pepper and Dr. Woodward immediately upon learning that they were the emergency-room doctors, when only one of them could have been involved in the legal relationship giving rise to the breach of duty alleged in the initial complaint. Such an amendment at that stage of the proceedings would have been wholly groundless as to one of them.