826 So.2d 825 (2001)
S.C.W.
v.
C.B.
P.D.
v.
R.E.L.
S.C.W. and S.D.H.
v.
C.B.
2990017, 2990464 and 2990483.
Court of Civil Appeals of Alabama.
January 12, 2001.
Opinion Corrected on Denial of Rehearing March 16, 2001.
*826 Shirley D. Howell of Howell & Talkington, L.L.C., Montgomery, for appellant S.C.W.
Pate Debardeleben, Montgomery, for appellants S.C.W. and P.D.
*827 Floyd Minor of Minor & Olszewski, L.L.C., Montgomery; and B. Andrew Whitmire, Jr., Birmingham, for appellees R.E.L., Jr., and C.A.L.
PER CURIAM
S.C.W., the putative father, appeals from a summary judgment in favor of the adoptive parents, R.E.L. and C.A.L. District Judge Phillip Wood, sitting by special appointment in this case, held that S.C.W. had failed to comply with § 26-10C-1, Ala. Code 1975, the Putative Father Registry Act, and had consented to the adoption of a child he had fathered. Judge Wood ordered S.C.W. to pay over $15,000 in attorney fees. He also sanctioned P.D. and S.D.H., S.C.W.'s attorneys, ordering them to pay a total of $7,500 under the Alabama Litigation Accountability Act. S.C.W. and his attorneys appeal.
On March 31, 1998, then 16-year-old C.B., the biological mother, discovered that she was pregnant. On that same day, unsure as to the identity of the biological father, C.B. told S.C.W. that she was pregnant, because, she says he was the last person with whom she had had sexual intercourse. C.B. had had sexual intercourse with another boyfriend a few weeks before she had sex with S.C.W. According to C.B., she and S.C.W. had discussed the option of abortion. At that point, S.C.W. had offered to help pay for an abortion if C.B. could find out the cost.
That same day, C.B. discussed her pregnancy with her best friend's mother, initially asking for her assistance in obtaining an abortion without her parents' knowledge. During this discussion, the friend's mother encouraged C.B. to tell her family. C.B. had stated during this discussion that she really did not want to have an abortion. That evening, C.B. discussed the pregnancy with her mother, T.H.; her stepfather; her family; and her pastor; she decided to place the baby for adoption. C.B. did not talk with S.C.W. again until Saturday, April 4, 1998, at a breakfast following a high-school senior prom. C.B. told S.C.W. that she had told her family that she was pregnant and that she wanted to place the baby for adoption. S.C.W. told C.B. that this was okay with him, and he asked if there was anything he needed to do.
S.C.W. told his parents, S.W. and A.W., about the pregnancy on April 5, 1998. That same evening S.C.W.'s mother, S.W., called C.B.'s mother, T.H., and asked if they could meet with her family. S.C.W. did not go with his parents to meet with C.B.'s family. A.W. and S.W. told T.H. that they wanted to rear the baby. T.H. told them that C.B. had decided to place the baby for adoption and that S.C.W. had agreed to C.B.'s decision. According to T.H., S.W. and A.W. offered money to help C.B. during the pregnancy.
On April 6, 1998, C.B. and S.C.W. talked at school and discussed the meeting between their parents. S.C.W. told C.B. that his parents did not want him to give up the baby, but he really did not want to keep the baby, because he was not ready to be a daddy. C.B. and S.C.W. talked on several occasions during the next few weeks. At no time did S.C.W. tell C.B. that he wanted to rear the child. Although S.C.W. stated in his deposition that C.B. said he could have the baby, C.B. stated that she never told him that.
According to T.H., S.W. telephoned her on two different occasions during April 1998 to ask about C.B. and to ask if "they" had decided to give "them" the baby. S.W. again offered money. T.H. told her that the baby would be placed for adoption. S.W. did not state that S.C.W. had changed his mind about C.B.'s decision to place the child for adoption. T.H. did not hear from S.W. and A.W. again until September 1998.
*828 At some point during C.B.'s pregnancy, S.W. and A.W. retained the services of a lawyer for S.C.W. The lawyer never told S.C.W. about the Putative Father Registry Act. T.H. and C.B. also retained a lawyer to advise C.B. of her legal obligations with regard to the planned adoption.
On July 21, 1998, C.B. chose R.E.L. and C.A.L. from a list of anonymous profiles to be her baby's adoptive parents. That same day, C.B. talked to C.A.L. on the telephone and arranged a meeting with R.E.L. and C.A.L. C.B., R.E.L., and C.A.L. discussed the idea of an open adoption whereby the child would know C.B. and would spend time with her, and they made plans for R.E.L. and C.A.L. to participate in the remainder of C.B.'s pregnancy and upcoming birth.[1]
In August 1998, C.B. returned to high school to finish her senior year. She saw S.C.W. at a party in August, but the two did not talk. On August 22, 1998, C.B. received a letter from S.C.W.'s attorney, stating that because it was known that S.C.W. was the biological father, S.C.W. wanted to participate in the birth and to assume custody of the child. C.B. did not respond to the letter, because it was not known at the time if S.C.W. was indeed the biological father. Also in August 1998, S.C.W. was arrested for possession of alcohol as a minor.
S.C.W. telephoned C.B.'s family once in September and again in October 1998, stating that he needed to get insurance and a baby-sitter for the child if the child was going home with him. A.W. telephoned T.H. on October 19, 1998, stating that "This has dragged on for eight months and we have given y'all every opportunity to talk to us and want you to understand that the actions we are about to take are going to embarrass you."
In October 1998 the child was born. On that same day, C.B., with her mother and her attorney present, executed a voluntary consent and relinquishment of custody of the child, for the purpose of placing her for adoption by R.E.L. and C.A.L.
Before the child's birth, R.E.L. and C.A.L. went to doctor's appointments and birthing classes. R.E.L. and C.A.L. were present during the birth, and the child has been in their custody and care since that day.
In Autauga County, on October 30, 1998, R.E.L. and C.A.L. filed a request for appointment of a guardian ad litem for C.B. and the child; a nomination of guardian ad litem for C.B.; an acknowledgement of minor birth parent; an affidavit of natural parent; and a consent of minor for adoption by R.E.L. and C.A.L. The probate judge appointed a guardian ad litem for C.B. and one for the child.
In Elmore County, on October 30, 1998, S.C.W. filed a notice of declaration of legitimation; a petition for a name change; and a request for an immediate hearing. Contrary to §§ 26-11-2 and -3, the Elmore County probate judge issued an ex parte order setting a hearing on November 10, 1998, on the petition for legitimation and request for a name change.
On October 31, 1998, C.B. was served through her mother, T.H., with the hearing notice from Elmore County. R.E.L. and C.A.L. were never served or made parties to the legitimation proceedings. On November 9, 1998, C.B. filed a nomination of guardian ad litem in the Elmore County proceedings. C.B. also filed an objection to the legitimation proceeding and a motion for a continuance. S.C.W. *829 filed an objection to C.B.'s motion for a continuance.
In Autauga County, on November 10, 1998, R.E.L. and C.A.L. filed their petition for adoption, pursuant to the requirements of § 26-10A-16. The Autauga County probate judge, pursuant to § 26-10A-18, issued an interlocutory order giving R.E.L. and C.A.L. legal custody of the child pending the final order of adoption.
Also on November 10, 1998, in Elmore County, the probate judge, without having jurisdiction over R.E.L., C.A.L., or the child, and under objection of C.B.'s guardian ad litem, held a hearing on the legitimation petition. The probate judge ordered that the Autauga County proceedings be suspended and that blood tests be performed. He also made rulings on custody and visitation. The probate judge appointed G.H. as a guardian ad litem for the child.
During this proceeding, the Elmore County probate judge, contrary to § 26-10A-31, ordered that the identity of the potential adoptive parents and their residence be disclosed in open court. This information was discovered through a subpoena duces tecum, without compliance with Rule 45(a)(3)(A), Ala.R.Civ.P., because notice was not properly given. At that time, S.C.W. and his counsel were placed on notice of the Autauga County proceedings as well as the identity and the residence of the potential adoptive parents.
On November 12, 1998, C.B. filed a notice of appeal of the legitimation proceeding and a motion for a stay. She also moved to transfer the case to the Elmore County Circuit Court and for a stay of judgment.
Even though the Elmore County probate judge's order was on appeal, based on lack of jurisdiction, and there was a motion to stay and a petition for removal to the circuit court, guardian ad litem G.H. obtained an ex parte order from the probate judge to take the child to a hospital for genetic testing.
On November 13, 1998, C.B. sought and received a temporary restraining order from the Elmore County Circuit Court. The circuit court set a hearing for the appeal of the legitimation proceeding for November 23, 1998. On November 18, 1998, S.C.W. moved for custody in the legitimation appeal.
On November 23, 1998, a hearing on the legitimation proceeding was held, over the objection of C.B.'s guardian ad litem, because C.B. was not able to attend the hearing due to a physician's order that she remain in bed. The circuit judge orally ordered that S.C.W. have custody of the child. However, R.E.L., C.A.L., and the child had not been made parties to this case and had not been afforded an opportunity to be heard. Apparently, the circuit court was not aware that in Autauga County an interlocutory order of adoption had been entered awarding custody of the child to R.E.L. and C.A.L.
The circuit judge asked G.H. to prepare a written order transferring custody. However, when R.E.L. arrived to obtain a copy of that order, the circuit judge became aware that R.E.L. was the potential adoptive parent and immediately recused himself, because he was a personal friend of R.E.L. On November 24, 1998, the legitimation appeal was assigned to Judge Wood, as a special circuit judge; he stayed the proceedings until November 30, 1998.
On November 30, 1998, Judge Wood ordered that temporary custody of the child would remain with R.E.L. and C.A.L., and he awarded S.C.W. limited visitation. The judge denied the motion to consolidate the cases in Elmore County and Autauga County, a motion filed by guardian ad litem G.H. The judge remanded the legitimation and name-change proceedings to *830 the probate court, instructing the probate judge to comply with § 26-11-1 et seq.
On November 30, 1998, the period lapsed for S.C.W. to file with the Department of Human Resources a notice of intent to claim paternity, as required by the Putative Father Registry Act, § 26-10C-1.
On December 1, 1998, S.C.W. petitioned for an adjudication of paternity and custody in the Elmore County Circuit Court, Juvenile Division. This is the first time R.E.L. and C.A.L. were made parties to the Elmore County proceedings. The child was never served with notice. S.C.W. also filed a motion contesting the adoption proceedings in Autauga County.
On S.C.W.'s motion filed in Elmore County, Judge Wood ordered that S.C.W., C.B., and the child submit to genetic testing. On December 22, 1998, results of the testing indicated that S.C.W.'s probability of paternity was 99.994%.
Sometime in January 1999, S.W., S.C.W.'s mother, contacted a local television station and provided a reporter with R.E.L. and C.A.L.'s names, address, and employment. She also provided the television reporter with documents relative to these proceedings. The news reporter told S.C.W. about the requirements of the Putative Father Registry Act, § 26-10C-1. On January 16, 1999, S.C.W. filed a notice of intent to claim paternity, pursuant to § 26-10C-1. On January 13, 1999, S.C.W., S.W., and A.W. filed a grievance with the Alabama State Bar against R.E.L., who is also assistant general counsel for the bar association.[2] The grievance, as well as the identity of C.B., a juvenile, were also given to the news reporter by S.C.W., S.W., A.W., and their attorney P.D.
On January 21, 1999, the Elmore County probate judge ordered that the legitimation be granted and that the child's name be changed. C.B. appealed that order and moved to consolidate the legitimation case with the paternity case that S.C.W. had filed in the Juvenile Division of the Elmore Circuit Court.
On January 22, 1999, Judge Wood consolidated the legitimation case and the paternity case, both originating in Elmore County, with the adoption case from Autauga County.
On January 25, 1999, S.C.W. petitioned this court for a writ of mandamus, seeking an order to enforce the probate judge's order of legitimation.
On February 4, 1999, S.C.W. moved to stay the proceedings while his mandamus petition was pending; his motion was granted. While these proceedings were stayed and his mandamus petition was pending, S.C.W. and his attorney improperly obtained a new birth certificate for the child. On April 20, 1999, this court, without an opinion, denied S.C.W.'s petition for a writ of mandamus. Ex parte S.C.W., 777 So.2d 334 (Ala.Civ.App.1999) (table). Subsequently, Judge Wood lifted the stay and allowed discovery to proceed. C.B., T.H., J.H., S.C.W., S.W., and A.W. were deposed.
On August 17, 1999, R.E.L., C.A.L., and C.B., filed joint motions to dismiss both the legitimation appeal and the paternity action. Also on August 17, 1999, R.E.L. and C.A.L. moved to remove G.H. as guardian ad litem for the child because of alleged conflicts of interest and inappropriate behavior. R.E.L. and C.A.L. also moved for an order directing compliance with Rule 18, Ala.R.Juv.P., wherein the proceedings are entitled to confidentiality. They filed a motion for sanctions and/or a contempt citation against S.C.W. and his *831 attorneys for violating confidential proceedings through contacts with the news media and for securing a change of the child's birth certificate while the proceedings were stayed. R.E.L. and C.A.L. also moved for a summary judgment, arguing that by failing to timely register under the Putative Father's Registry, S.C.W. had consented to the child's adoption, pursuant to § 26-10C-1(i).
On September 1, 1999, a hearing was held in the juvenile division in Elmore County. On September 1, 1999, Judge Wood entered an order dismissing the legitimation appeal, on the basis of a lack of jurisdiction, based on S.C.W.'s failure to serve R.E.L., C.A.L., and the child as required by §§ 26-11-2(b) and 26-11-3(b) and Rule 4(c)(2), Ala.R.Civ.P. The court determined that the legitimation and name-change proceedings were void. The court had to order the Bureau of Vital Statistics to reissue the birth certificate in the child's name because S.C.W. did not have the legal authority to change the child's birth certificate. The court also held that the probate court was without authority to appoint a guardian ad litem for the child because it lacked jurisdiction. Also on September 1, 1999, Judge Wood entered a summary judgment in favor of R.E.L. and C.A.L. based on S.C.W.'s failure to comply with § 26-10C-1.
On September 14, 1999, S.C.W. moved for a declaratory judgment, questioning for the first time the constitutionality of the Putative Father Registry Act. On September 16, 1999, Judge Wood denied the motion.
On October 6, 1999, R.E.L. and C.A.L. moved for an award of costs pursuant to § 26-10A-24(i), which provides that when an adoption contest fails the court shall order that the petitioner be reimbursed for all legal costs. In their motion, R.E.L. and C.A.L. argued that S.C.W. had filed unnecessary and frivolous proceedings, had failed to comply with state law, and had violated their privacy rights during these proceedings. They also argued that S.C.W.'s conduct was advised and condoned by his attorneys. R.E.L. and C.A.L. also moved for an award of legal fees pursuant to § 12-19-270, the Alabama Litigation Accountability Act.
S.C.W. appealed from the summary judgment entered in favor of R.E.L. and C.A.L. However, on January 4, 2000, this court remanded the case with instructions for the court to conduct a final dispositional hearing on the adoption petition.
On January 24, 2000, R.E.L. and C.A.L. moved for a protective order, because the circuit clerk, contrary to the court's earlier order that the proceedings be confidential, had copied the sealed records and had given the copy to S.C.W.'s attorneys. R.E.L. and C.A.L. contended that S.C.W. and his attorneys had a proclivity toward publicizing private information included in these records and argued that that proclivity mandated that after the appeal was over all the records be returned to the court and that S.C.W. under no circumstance make public any information discovered in the file. Judge Wood granted the order.
R.E.L. and C.A.L. also moved to bifurcate the adoption proceeding and the pending motions regarding attorney fees. Judge Wood granted the motion to bifurcate and to conduct separate hearings on the motions for costs and attorney fees and the final disposition of the adoption matter.
At a hearing on January 24, 2000, the trial court heard the pending motion, made pursuant to § 29-10A-24(i), for costs incurred in the adoption contest and the pending motion for attorney fees pursuant to § 12-19-270. At the conclusion of the hearing, Judge Wood took the matter under advisement and excused S.C.W. and his attorneys.
*832 Judge Wood then conducted a final dispositional hearing on the adoption. R.E.L., C.A.L., their attorneys, and a guardian ad litem for the child were present. At the conclusion of the hearing, Judge Wood entered a final judgment of adoption, granting R.E.L. and C.A.L.'s petition to adopt the child.
On January 24, 2000, Judge Wood entered an order pursuant to § 12-19-270, finding that the claims and motions filed in this proceeding were, in part, without substantial justification and had caused unnecessary delay. He also found that this action was, in part, prosecuted by S.C.W. in name only, and had been maintained primarily to promote the interests and fulfill the threats of his parents; thus, he held, the action had been maintained for an improper motive and contrary to the best interests of the child. Judge Wood further found that S.C.W., his parents, and his attorney, P.D., had unlawfully publicized these confidential and private proceedings involving two juveniles, in an attempt to put public pressure on the court and to cast C.B., R.E.L., and C.A.L. in a bad light, thereby violating their privacy and adversely affecting the best interests of the child. Judge Wood also determined that S.C.W. and his counsel had made no effort to determine the proper procedure before filing his actions. Judge Wood ordered that attorney P.D. pay $6,000 and that attorney S.H. pay $1,500. Judge Wood also ordered that S.C.W. pay R.E.L. and C.A.L. $15,979.36, pursuant to § 26-10A-24(i).
"`Adoption is not merely an arrangement between the natural parents, but is a status created by the state acting as parens patriae, the sovereign parent.'" Ex parte Sullivan, 407 So.2d 559, 563 (Ala. 1981), quoting Davis v. Turner, 337 So.2d 355, 360-61 (Ala.Civ.App.1976). It is well settled that, because adoption is purely statutory, strict compliance with the statutes is required. S.D. v. R.D., 628 So.2d 817 (Ala.Civ.App.1993).
The Alabama Legislature established the Putative Father Registry Act in 1997. It provides that one claiming to be the father of a child born out-of-wedlock must comply with certain legal requirements in order to establish parental rights. Section 26-10C-1(f) provides that his failure to file with the Department of Human Resources a notice of intent to claim paternity, either before the child's birth or within 30 days after the child's birth, will result in the unwed father's being deemed to have given his irrevocable consent to any adoption proceeding. Rather than comply with § 26-10C-1, S.C.W. petitioned for legitimation. We note that in those proceedings, S.C.W. failed to join indispensable and necessary parties.
It is presumed that statutes are enacted with meaningful purposes. Ex parte Uniroyal Tire Co., 779 So.2d 227 (Ala.2000). "The Legislature will not be presumed to have done a futile thing in enacting a statute." Ex Parte Watley, 708 So.2d 890, 892 (Ala.1997). One of purposes behind the Act is to include the putative unwed father in an adoption proceeding when he has timely filed notice, in order to prevent different courts from addressing the proposed adoption. It appears that S.C.W. asks this court to ignore his failure to comply with § 26-10C-1 and to allow his legitimation proceeding, which failed to include indispensable parties, in violation of §§ 26-11-2(b) and 26-11-3(b), to substitute for compliance with § 26-10C-1.
In the widely publicized recent case of Ex parte C.V., [Ms. 1981316, November 17, 2000],[*] ordering that a 4 ½-year-old child *833 be sent to his putative biological father, a plurality of the supreme court reaffirmed the long-standing rule that adoption statutes must be strictly adhered to. That case arose in 1995 and had been before numerous courts in both Florida and Alabama. The Florida courts eventually declined to continue exercising jurisdiction over the father's paternity and custody action. This court adopted the law of Florida on prebirth abandonment and held that the putative father's actions, including striking the mother while she was pregnant, amounted to an implied consent to adoption. A plurality of the supreme court reversed our decision and held that prebirth conduct of the father toward the birth mother was not a ground under the Adoption Code, as it read in 1995, for implying consent to an adoption. The legislature later amended the Adoption Code, effective in 1999, to include prebirth conduct as a ground for implied consent. Although Ex parte C.V. did not involve the Putative Father Registry Act, it does show the supreme court's adherence to strict enforcement of the adoption statutes.
On appeal, S.C.W. challenges the constitutionality of § 26-10C-1. However, S.C.W. did not properly raise the constitutionality of § 26-10C-1. R.E.L. and C.A.L. filed a summary-judgment motion arguing that S.C.W.'s failure to comply with § 26-10C-1 gave his irrevocable consent to the adoption. In response, S.C.W. did not argue that § 26-10C-1 was unconstitutional.[3]
"A trial court decides a motion for summary judgment upon a consideration of whatever materials are submitted in support of or in opposition to the motion. Ex parte City of Montgomery, 758 So.2d 565 (Ala.1999), and Moore v. Glover, 501 So.2d 1187 (Ala.1986). The trial court cannot consider any facts not of judicial notice except those facts evidenced by materials contained in the trial court record upon submission of the motion for summary judgment. See Moore, supra. Likewise, the trial court cannot be reversed on any ground or argument not presented for or against the motion. MetFuel, Inc. v. Louisiana Well Service Co., 628 So.2d 601 (Ala.1993), and Bevill v. Owen, 364 So.2d 1201 (Ala.1979).
"An appellate court can consider a fact to support or to undermine a summary judgment only to the extent that the record on appeal contains materials from the record before the trial court evidencing that fact at the time of submission of the motion for summary judgment. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991). Likewise, the appellate court can consider an argument against the validity of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting *834 that argument to the trial court before or at the time of submission of the motion for summary judgment. Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala. 1992). On the other hand, an appellate court can affirm a summary judgment on any valid argument, regardless of whether the argument was presented to, considered by, or even rejected by the trial court. Ex parte Wiginton, 743 So.2d 1071 (Ala.1999), and Smith v. Equifax Services, Inc., 537 So.2d 463 (Ala.1988)."
Ex parte Ryals, 773 So.2d 1011, 1013 (Ala. 2000).
S.C.W. argues that he raised the constitutionality of § 26-10C-1 in his mandamus petition filed with this court and that that is sufficient for this court to address the constitutional issue on his appeal from the summary judgment. We disagree. S.C.W. did not raise the constitutionality in response to the summary-judgment motion. Raising that issue in a mandamus petition that was before this court and that was subsequently denied, does not mean that the trial court addressed that issue or that that issue was presented to the trial court. Accordingly, we conclude that the constitutional issue was not before the trial court when the summary-judgment motion was submitted. Constitutional issues must be specifically identified and argued to the trial court in order to be preserved for appellate review. Alabama Power Co. v. Turner, 575 So.2d 551 (Ala.1991), cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991). S.C.W. also contends that his motion for a declaratory judgment, filed after the summary-judgment motion was submitted, was sufficient to raise the issue. As the supreme court held in Ex parte Ryals, supra, an appellate court can consider an argument against the propriety of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting that argument to the trial court before or at the time of submission of the motion for summary judgment.
Furthermore, this court has already addressed the constitutionality of § 26-10C-1, in dicta, in M.V.S. v. M.D., 776 So.2d 142 (Ala.Civ.App.1999). Even if S.C.W. had properly raised the issue of the constitutionality of the Putative Father Registry Act, M.V.S. is dispositive of that issue.
In M.V.S., the probate court determined that the person claiming to be the biological father had failed to establish a substantial relationship with the child and, therefore, had relinquished any right to be recognized as the father of the child. He lacked standing to challenge the constitutionality of § 26-10C-1, because, in spite of his not complying with the Putative Father Registry Act, he was given notice of the adoption proceeding and was given a full opportunity to be heard in contesting the adoption before the final order of adoption was entered. Nevertheless, we addressed the constitutionality of the Act.
"On January 1, 1997, the Putative Father Registry Act became effective. The Act directs the Department of Human Resources to establish a registry of fathers of children born out of wedlock. § 26-10C-1. The registry includes a putative father's name, Social Security number, date of birth, and address. § 26-10C-1(a). Names are gathered from two sources: adjudications of paternity in Alabama courts and the courts of other states, and voluntary filings from men who wish to claim paternity or who have already acknowledged a child through legitimization, as provided for in § 26-11-1 through § 26-11-3. § 26-10C-1(a).
"Upon an adjudication of paternity, the Alabama courts are required to supply the registry with the pertinent information. § 26-10C-1(b). If, pursuant to *835 the Act, a putative father wishes to file a notice of intent to claim paternity, he must include the prescribed information about himself, the mother, the infant, and the possible dates of conception. § 26-10C-1(c). Failure to file a notice of intent to claim paternity before the child's birth or within 30 days after the child's birth will result in the father's being deemed to have given irrevocable implied consent to any adoption proceeding. § 26-10C-1(f). If he files a notice of intent to claim paternity, the putative father is entitled to notice of the pendency of an adoption proceeding involving the child. § 26-10C-1(f). Also, a notice, once filed, can be revoked at any time. § 26-10C-1(d). An unrevoked notice may be used as evidence by anyone other than the putative father in any action where paternity of the child is relevant. § 26-10C-1(e).
"Any court may obtain the names and addresses of persons listed on the registry from the Department of Human Resources. § 26-10C-1(f). The Department of Human Resources must also send a copy of the notice of intent to claim paternity to any court handling the adoption of a child born to a woman listed in the registry as having had sexual intercourse with the putative father within 300 days before the birth of the child. § 26-10C-1(f). Otherwise, the registry is completely confidential. § 26-10C-1(f).
"Anyone who knowingly or intentionally registers false information with the registry commits a Class A misdemeanor. § 26-10C-1(j)(1). Likewise, any person who knowingly or intentionally releases confidential information included in the registry commits a Class A misdemeanor. § 26-10C-1(j)(2). An affirmative defense to such a release under this subsection of the Act is provided for Department of Human Resources employees who act in good faith and with reasonable diligence. § 26-10C-1(j)(2).
"The legislature apparently concluded that a man concerned that he has impregnated a woman, and who is interested in taking responsibility for his offspring, should take affirmative action by filing with the registry. The effort required for filing with the registry is minimal. In fact, the legislature mandated that the Department of Human Resources create a form to case the filing requirements. See § 26-10C-1(g). The [United States] Supreme Court noted in Lehr [v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983),] that the unwed father's right to notice of adoption proceedings was within his control because, `by mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [the child].' 463 U.S. at 264, 103 S.Ct. 2985.
"The Supreme Court in Lehr ruled that due process for unwed fathers requires that state law provide an adequate opportunity for them to claim paternity and to take responsibility for their children in a timely manner. Lehr recognized that limits on procedural protection for a putative father are necessary from the perspective of the child, who needs a stable start in life and needs stability early.
". . . .
"The Alabama legislature has made the policy decision that the father of a child born out of wedlock must comply with certain legal requirements in order to establish parental rights. We do not think it violates the constitutional guarantee of due process, or that it is even harsh, to require those responsible for bringing children into the world outside of marriage to comply with those statutes that give them the opportunity to *836 assert parental rights. In particular in this case, we are not dealing with a case where the father did not know of the pregnancy and the birth. Therefore, even if the probate court had not afforded M.V.S. a hearing, because of his failure to register the claim of paternity within 30 days of the child's birth, as required by § 26-10C-1, such a denial would not have been unconstitutional."
M.V.S., 776 So.2d at 149-50.
In M.V.S., this court discussed cases from other jurisdictions with paternity-registry laws. Courts in Nebraska, Utah, Oregon, Oklahoma, and Illinois have held that strict compliance with their registry acts was necessary. For example, in Friehe v. Schaad, 249 Neb. 825, 545 N.W.2d 740 (1996), the Nebraska Supreme Court upheld the constitutionality of its putative-father-registry act, which provided for filing a notice of intent to claim paternity within 5 days of the birth of the child. In Friehe, the unwed father had been dating the child's mother and had indicated that he wanted to rear the child himself. The unwed mother ultimately decided to give the child up for adoption. The court held that the unwed father's consent to the adoption was not necessary, because he had failed to timely file a notice of intent to claim paternity under the act. See also Wells v. Children's Aid Society of Utah, 681 P.2d 199 (Utah 1984) (court upheld statute against due process challenge requiring putative father to file his notice to claim paternity); Hylland v. Doe, 126 Or.App. 86, 867 P.2d 551 (1994) (unwed father's failure to file notice of paternity barred him from receiving notice of petition for adoption); In re C.J.S., 903 P.2d 304 (Okla.1995) (putative father not statutorily entitled to notice of hearing or a petition to terminate his parental rights); Petition of K.J.R., 293 Ill.App.3d 49, 227 Ill.Dec. 190, 687 N.E.2d 113 (1997) (birth mother's misrepresentation that putative father was not the father did not excuse the putative father's failure to register with the putative father registry).
The majority in M.V.S. also addressed whether § 26-10C-1 violated the Equal Protection Clause of the United States Constitution and concluded that rational-basis scrutiny would apply where a putative father was arguing that he was being treated differently from other putative fathers. We further held that treating fathers who have registered under the Act differently from those who have not registered, is rationally related to a legitimate government interest. "The putative father registry provides a legal means to ascertain within a short time of a child's birth whether the biological father is going to assert his rights and perform his corresponding duties." M.V.S., 776 So.2d at 153. The majority of this court in M.V.S. also noted that the case did not involve the constitutionality of terminating an established familial bond, but instead concerned the constitutionality of terminating the opportunity to form such a bond. Cf. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (Supreme Court held that notice provision of registry act adequately protected the unwed father's inchoate interest in establishing a relationship with his child).
In M.V.S., we also discussed the relationship between the Putative Father Registry Act and the Alabama Adoption Code, stating:
"[T]he Putative Father Registry Act must be read in pari materia with the Alabama Adoption Code. Section 26-10A-17(a)(10), a part of the Alabama Adoption Code, requires that a putative father be given notice of a pending adoption. Section 26-10A-7(5), also a part of the Alabama Adoption Code, requires the putative father's consent or relinquishment if he has responded within 30 days to the notice he received under *837 § 26-10A-17(a)(10). Section 26-10C-1(i) of the Putative Father Registry Act, which went into effect in 1997, now provides that the putative father will irrevocably consent to an adoption unless, within 30 days of the birth of the child, he files a notice to claim paternity. Only where the putative father has complied with the provisions of the Putative Father Registry Act is the consent of the father to the adoption required today. Section 26-10C-1(f), specifically provides that when the court handling the adoption `receives said notice of the intent to claim paternity, that court shall forthwith give notice of the pendency of the adoption proceeding to the putative father listed in such notice of intent to claim paternity.' There would be no purpose in providing unregistered putative fathers with notice under § 26-10A-17(a)(10), because a right to consent to the adoption would have been waived by a failure to register under the newly enacted Putative Father Registry Act. Putative fathers who have registered would be entitled to notice under § 26-10A-17(a)(10), and their consent or relinquishment would be required under § 26-10A-7(5), provided that they responded within 30 days of the notice of the pending adoption."
M.V.S., 776 So.2d at 153-54.
Although S.C.W. argues basically that he substantially complied with the Putative Father Registry Act by filing a legitimation proceeding in another court, to adopt an alternative method for establishing paternal rights would violate the legislature's clear mandate under the Act. As to Judge Crawley's contention that S.C.W.'s actions were a permissible substitute for complying with the law, we disagree. One of the purposes of the Putative Father Registry Act is prevent precisely what happened in this case with separate actions in different courts with potentially different results. The Act gives the unwed father notice and an opportunity to be heard before any adoption proceeding, if he timely registers under the Act. Judge Crawley also envisions that § 26-10A-7, which sets out the persons whose consent or relinquishment is needed for an adoption, establishes an alternate method of complying with the Putative Father Registry. We first note that S.C.W. did not make this particular argument in his brief. Second, § 26-10A-7(5), provides that the putative father's consent or relinquishment is needed "if made known by the mother or is otherwise made known to the court provided he responds within 30 days to the notice he receives under Section 26-10A-17(a)(10)." The legislature has established the method for the unwed father to make his intent to claim paternity known to the court, and that is through the Putative Father Registry Act. To do otherwise would be to ignore the law and the legislature's intent in enacting the Act, which was to provide unwed fathers with a way if they desire to raise their child to act responsibly and follow the law.
We note that some of the facts in this case are in dispute, although it is undisputed that S.C.W. did not comply with § 26-10C-1. According to C.B., the biological mother, S.C.W. did not object to her placing the child for adoption. Also, S.C.W. indicated in his deposition that it is his parents who want to rear the child. S.C.W.'s parents have hired at least three attorneys; S.C.W. never talked to the first attorney. S.C.W. offered no support to C.B. during her pregnancy. Rather, his parents made an offer of money. Although S.C.W. and his parents decided to "lay low" during the first six months, that was their choice.
S.C.W. stated in his deposition that he works during the day and that his mother was planning to stay at home and take *838 care of the child. Even now, as S.C.W. is claiming that he has life insurance on the child, it is his parents who are paying the premiums. S.C.W. is planning to live at his parents' home and have the child sleep in his room. S.C.W. does not pay rent to his parents and apparently is covered by his father's health-insurance policy. S.C.W.'s mother testified that she, not S.C.W., had kept notes concerning all the conversations and actions in this case. S.C.W.'s mother also admitted that she had disclosed to a television news reporter the identity of the adoptive parents after she had improperly obtained this confidential information.
S.C.W.'s attorneys, P.D. and S.D.H., appeal the trial court's award of attorney fees to R.E.L. and C.A.L. pursuant to § 12-19-270 et seq., the Alabama Litigation Accountability Act. Section 12-19-272 provides that a court may assess attorney fees against an attorney or a party that brings an action or claim "without substantial justification." Section 12-19-271(1) defines an action "without substantial justification" as an action that is "frivolous, groundless in fact or law, vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation as determined by the court." The trial court, to award attorney fees, must make specific findings that the action was brought "without substantial justification." Pacific Enters. Oil Co. v. Howell Petroleum Corp., 614 So.2d 409 (Ala.1993).
The trial court stated that S.C.W.'s contest to the adoption was made without substantial justification. The court also stated that S.C.W.'s and his attorneys' actions "unnecessarily expanded these proceedings and caused unnecessary delay." The trial court also stated that S.C.W.'s attorneys and his parents illegally publicized the adoption contest as a means of subjecting the court to public pressure.
It is undisputed that S.C.W. and his parents knew of the pregnancy in the first trimester. S.C.W.'s parents hired attorneys for him shortly thereafter. Rather than comply with the law as mandated by the legislature in the Putative Father Registry Act, S.C.W. and his attorneys chose to file separate actions. As we stated earlier, one of the purposes of the Putative Father Registry Act is to prevent separate actions in different courts. The Putative Father Registry Act, when complied with, prevents unnecessary delay and prevents heart-wrenching situations created by lengthy court battles. See Ex parte C.V., supra.
The legitimation and name-change proceedings were not only unnecessary, in light of the Putative Father Registry Act, but also failed to join necessary and proper parties under § 26-11-2(b) and § 26-11-3(b) and Rule 19, Ala.R.Civ.P. The record also contains motions filed by S.C.W. and his attorneys intended to cause delay and to harass C.B., R.E.L., and C.A.L. Also, P.D. improperly obtained a new birth certificate for the child while the proceedings had been stayed, based on S.C.W.'s motion to stay. We also note that P.D. participated in publicizing this case in the news media and by doing so aided in publicly bastardizing the child. Many unnecessary motions, including motions regarding custody and visitation, were filed by S.C.W.'s attorney S.D.H.
Section 26-10A-24(i), as amended in 1999, provides:
"Where there is a contested hearing and the contest fails, then the probate court or court of competent jurisdiction, unless just cause is shown otherwise by the contestant, shall issue an order for reimbursement to the Petitioner or Petitioners for adoption all legal costs incurred *839 which are incidental to the contest."
Generally, a statute will not be construed to apply retrospectively unless the legislature clearly expresses an intent that it be so applied. Street v. City of Anniston, 381 So.2d 26 (Ala.1980). However, there is an equally well-established exception, which provides that remedial statutes are not within the concept of retrospective laws and do operate retroactively, in the absence of language clearly showing a contrary intent. Ex parte Bonner, 676 So.2d 925, 926 (Ala.1995).
"`Remedial statutesthose which do not create, enlarge, diminish, or destroy vested rightsare favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law.' Ex parte Burks, 487 So.2d 905, 907 (Ala.1985) (emphasis added) (quoting Barrington v. Barrington, 200 Ala. 315, 316, 76 So. 81, 82 (1917)). Remedial statutes are exemplified by those that `"impair no contract or vested right, ... but preserve and enforce the right and heal defects in existing laws prescribing remedies."` Jones [v. Casey] 445 So.2d [873,] 875 [Ala. (1983)] (quoting Dickson v. Alabama Mach. & Supply Co., 18 Ala.App. 164, 165, 89 So. 843, 844, cert. denied, 206 Ala. 698, 89 So. 922 (1921))."
Ex parte Bonner, 676 So.2d at 926.
We hold that the right to an attorney fee is substantive in nature. Although the right to an award of attorney fees is remedial in the technical sense that it relates to a remedy, an amendment to a statute that creates a new right to an award of attorney fees creates a substantive right. The 1999 amendment is substantive, because it gives the adoptive parents the right to recover money from the person who contested the adoption, a person who did not, before the amendment, have the obligation to pay that money. Accordingly, we reverse that portion of the trial court's judgment ordering S.C.W. to pay R.E.L. and C.A.L. $15,979.36, and hold that the 1999 amendment cannot be applied retroactively.
We affirm the summary judgment entered in favor of R.E.L. and C.A.L. We also affirm the award of attorney fees pursuant to § 12-19-270, with regard to attorney P.D. and attorney S.D.H. We reverse that portion of the judgment awarding R.E.L. and C.A.L. attorney fees pursuant to § 26-10A-24(i).
S.C.W.'s request for an attorney fee on appeal is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., concurs in part and dissents in part.
CRAWLEY, J., concurring in part and dissenting in part.
I concur in that portion of the judgment and the opinion reversing the order requiring S.C.W. to pay the adoptive parents' attorney fees pursuant to Ala.Code 1975, § 26-10A-24(i); however, I must dissent as to the remainder of the judgment and the opinion. Although I continue to adhere to my belief that the Putative Father Registry Act, Ala.Code 1975, § 26-10C-1, may be unconstitutional in certain circumstances, see M.V.S. v. M.D., 776 So.2d 142, 154 (Ala.Civ.App.1999) (Crawley, J., dissenting), I do not believe a resolution of that issue is necessary in this case.
Instead, I believe that the Putative Father Registry Act and portions of the Alabama Adoption Code conflict, and, by harmonizing the two statutes, I conclude that registering with the putative-father registry is but one way a putative father like *840 S.C.W. can entitle himself to receive notice of, and a right to contest, the proposed adoption of his child. Therefore, I would reverse the summary judgment holding that the putative father had irrevocably impliedly consented to the adoption pursuant to § 26-10C-1(i), would vacate the judgment finalizing the adoption, and would instruct the court to hold a contested hearing, pursuant to Ala.Code 1975, § 26-10A-24. In light of my resolution of what I perceive as a conflict between the statutes, I would also reverse the sanctions imposed against P.D. and S.D.H. pursuant to Ala.Code 1975, § 12-19-270 et seq., the Alabama Litigation Accountability Act (the "ALAA").
The majority opinion questions S.C.W.'s motive and intent in seeking custody of the child and faults his parents' involvement in the proceedings. The majority also emphasizes what it considers to be S.C.W.'s character flaws. Those facts are simply not relevant to the legal arguments at issue in this case.

The Effect of the Putative-Father Registry on the Alabama Adoption Code
Section 26-10A-17, Ala.Code 1975, a part of the Alabama Adoption Code, lists the persons who must receive notice of an adoption proceeding. One of those persons is "the putative father of the adoptee if made known by the mother or otherwise known by the court." See § 26-10A-17(a)(10). Section 26-10A-7, Ala.Code 1975, lists the persons whose consent (or whose relinquishment of the child) is required for an adoption. One of those persons is "[t]he putative father if made known by the mother or ... otherwise made known to the court provided he responds within 30 days to the notice he receives under Section 26-10A-17(a)(10)." See § 26-10A-7(5), Ala.Code 1975. "The persons listed in section 26-10A-7 have an absolute veto power over the proposed adoption." § 26-10A-7 (Commentary).
The foregoing statutes demonstrate that the Alabama Adoption Code gives a putative father the right to veto the adoption of his biological child when two circumstances are present: (1) the court is made aware of the identity of the putative father, and (2) the putative father, having received notice of the proposed adoption, responds to the notice within 30 days. Both circumstances are present in this case.
The court handling the adoption was made aware of the identity of the putative father. On October 30, 1998, when the child was two days old, the adoptive parents filed an adoption petition in the Autauga Probate Court. On November 12, when the child was 15 days old, the putative father was "made known to the court" when the guardian ad litem appointed by the Elmore Probate Court to represent the child in the legitimation proceeding informed the adoption court that the putative father had previously filed a declaration of legitimation in the Elmore Probate Court and wished to contest the adoption.
The putative father timely responded to the notice of the adoption proceeding. On December 24, the putative father was served with the adoption petition. On December 1, the putative father, apparently having had actual knowledge of the petition before December 24, filed a contest of the adoption. It is undisputed that the putative father "respond[ed] within 30 days to the notice he receive[d] under Section 26-10A-17(a)(10)."
Reading only the provisions of the Alabama Adoption Code in isolation, I think it is clear that a putative father like S.C.W., whose identity was made known to the court and who timely responded to the notice provided him, had the power to halt the adoption of his child. However, S.C.W. was unable to prevent the adoption *841 in this case because the adoptive parents convinced the trial court that the provisions of another statute, outside the Alabama Adoption Codea statute neither cross-referenced nor mentioned by name in the Alabama Adoption Code itselfsuperseded the provisions of the Alabama Adoption Code. The statutory provision upon which the adoptive parents relied is known as the "Putative Father Registry Act" and is found at § 26-10C-1, Ala.Code 1975.
The Putative Father Registry Act directs the Department of Human Resources ("DHR") to establish a registry for males who intend to claim paternity of a child born out of wedlock, or whose paternity of such a child has been adjudicated or acknowledged. The Act requires that a notice of intent to claim paternity include the names of the father and mother of the child born out of wedlock, their addresses, Social Security numbers, and dates of birth, as well as current income and financial information concerning the father. The Act dictates that the child's name and place of birth, if known, and the date or dates of sexual intercourse between the parents, be listed. Subsection (f) of the Act provides that the information contained in the registry shall not be divulged except upon court order. That subsection further directs DHR, when it receives notice of a pending adoption, to search the registry for a correspondence between the biological mother, the prospective adoptee's date of birth, and the information provided by putative fathers. The statute mandates that, if DHR finds a correspondence, it must notify the court handling the adoption of the putative father's notice of intent to claim paternity of the prospective adoptee so that notice of the pending adoption can be given to him.
Subsection (i) of the Act provides:
"Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding."
§ 26-10C-1(i), Ala.Code 1975.
Subsection (i), a part of the Putative Father Registry Act, establishes the irrevocable implied consent to adoption of any putative father who fails to file with the registry. Section 26-10A-7(5), a part of the Alabama Adoption Code, gives a putative father whose identity has been made known to the court and who timely responds to notice of the adoption, veto power over an adoption. Sections 26-10C-1(a) and (i) appear to authorize only one way for a putative father to be "made known" to an adoption court, namely: the putative father must file with the putative-father registry. On the other hand, § 26-10A-7(5) seems to envision more than one way in which a putative father could be "made known" to the adoption court, namely: (1) the biological mother could make the court aware of the putative father or (2) the putative father could be "otherwise known by the court." The last or "catchall" means of making a putative father known to the courtthe "otherwise-known-by-the-court" methodis, in contrast to the relevant section of the Putative Father Registry Act, open-ended, comprehensive, and nonexclusive. The catchall provision encompasses, for example, the means employed in this case: notification by a guardian ad litem. The provision does not exclude such other ways of making a putative father "known by the court" as the court's noting that the putative father has filed a paternity action or a declaration of legitimation. The exclusivity of the method for making a putative father known to the court provided by the Putative Father Registry Act contrasts sharply with the inclusivity of the catchall provision in the *842 Alabama Adoption Code. The two statutes conflict.
It is well settled that adoption is purely statutory, unknown to the common law, and that strict statutory adherence is required. Ex parte Sullivan, 407 So.2d 559 (Ala.1981). Because the Alabama Adoption Code is a comprehensive legislative package relating to a single subject, I cannot conclude that the Putative Father Registry Act (a later enactment not a part of the Alabama Adoption Code) repeals by implication inconsistent portions of the Alabama Adoption Code. Repeal by implication is not favored in the law. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). Repeal by implication is found "only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter should repeal the former." City of Birmingham v. Southern Express Co., 164 Ala. 529, 538, 51 So. 159, 162 (1909) (quoted in Hall v. Teipie-Ching Chi, 782 So.2d 218, 222 (Ala.2000)). Unless two statutes are in irreconcilable conflict, it is the court's duty to regard each as effective and to arrive at a construction that will harmonize the seeming conflict and give each statute a reasonable field of operation. See, e.g., Benson v. City of Birmingham, 659 So.2d 82 (Ala.1995).
"Courts are not at liberty to pick and choose among legislative enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed legislative intention to the contrary, to regard each as effective."
Hayden v. Blue Cross & Blue Shield of Alabama, 843 F.Supp. 1427, 1437 (M.D.Ala.1994). This court has the duty to construe provisions within a statutory plan in harmony with each other. J.N.H. v. N.T.H., 705 So.2d 448 (Ala.Civ.App.1997). In interpreting statutory language, a court does not look at one word or one provision in isolation, but rather looks to a whole statutory scheme for clarification and contextual reference. United States v. McLemore, 28 F.3d 1160 (11th Cir.1994). An adoption statute "should be interpreted to give consistent, harmonious and sensible effect to all its parts." N. Singer, 3A Sutherland Statutes and Statutory Construction § 68.04 at 104 (5th ed.1992).
Applying the foregoing principles of statutory construction to the inconsistency between § 26-10A-7(5) and § 26-10C-1(i), I would hold that the conflict between the Alabama Adoption Code and the Putative Father Registry Act is not irreconcilable, and that it is possible to construe the provisions so that each statute has a reasonable field of operation. I would conclude that, because § 26-10A-7(5)the consent provision of the Alabama Adoption Codeis part of a unified scheme relating to a single subject, one portion of a comprehensive whole, it takes priority over § 26-10C-1(i)the irrevocable-implied-consent provision of the Putative Father Registry Actbecause the latter statute is a separate enactment, outside the Alabama Adoption Code, and is not cross-referenced by the Alabama Adoption Code. Other jurisdictions that give preclusive effect to a man's failure to file with a putative-father registry state (or at least cross-reference) in their adoption codes the requirement of filing with the registry. See Ariz.Rev.Stat. Ann. § 8-106.01 (1997); Conn. Gen.Stat. Ann. §§ 45a-716 and 45a-724 (1996); Ga. Code Ann. § 19-11-9 (1997); Idaho Code § 16-1513 (1994); 750 Ill. Comp. Stat. 50/12 (West 1997); Ind.Code § 31-19-5-12 (1997); La.Rev.Stat. Ann. § 9:400 (1993); Mich. Comp. Law § 710.33 (1993); Minn. Stat. § 259.52 (1997); Mo.Rev.Stat. § 453.030 (1997); Neb.Rev.Stat. § 43-104.02 *843 (1997); 1993 N.M. Laws § 32-A-5-19 (1997); N.Y. Dom. Rel. Law § 111-a (McKinney 1997); Ohio Rev.Code Ann. § 3107.062 (Anderson 1996); Okla. Stat. tit. 10, § 7506-1.1 (1998); Tenn.Code Ann. § 36-2-318 (1997); Utah Code Ann. § 78-30-4.14 (1995); Wyo. Stat. Ann. § 1-22-117 (1995). The Alabama Adoption Code does not mention the Putative Father Registry Act.
The Putative Father Registry Act has two purposes: "protecting the rights of responsible fathers and facilitating speedy adoptions of children whose fathers do not wish to assume parental responsibility." Note, "Protecting the Unwed Father's Opportunity to Parent: A Survey of Paternity Registry Statutes," 18 Rev. Litig. 703, 727 (1999). Those purposes are not undermined by allowing a putative father to be "made known" to the adoption court in a variety of ways (such as by the putative father's filing a paternity action or a declaration of legitimation). The Putative Father Registry Act can be harmonized with the Alabama Adoption Code by holding that filing with the registry is just one of several ways in which a putative father can bring about judicial awareness of his paternity claim. Cf. Diemert v. City of Mobile, 474 So.2d 663 (Ala.1985) (holding that §§ 11-47-192 and 11-47-23, which require a claimant to file a sworn statement with the municipal clerk within six months of the accrual of a tort claim against the City, are satisfied by filing a complaint against the City within the limitations period). I see no need to outline all of the means by which a putative father can, consistent with the dictates of the Alabama Adoption Code, bring his claim to the attention of a judicial tribunal, but I would hold that the means employed by the putative father in this casefiling a declaration of legitimation and a paternity complaintwere sufficient. Those means were not only equivalent to filing with the putative-father registry, but were, in fact, superior. The Putative Father Registry Act requires a notice of intent to claim paternity. S.C.W.'s legitimation and paternity actions constituted actual claims of paternity. To hold that, by failing to file with the registry, S.C.W. had given his irrevocable implied consent to the adoption, notwithstanding his filing two lawsuits demonstrating his strenuous objection to the adoption, would be an extreme case of elevating form over substance.

ALAA Sanctions
The putative father's attorneys appeal the trial court's award of attorney fees to the adoptive parents pursuant to the ALAA. Section 12-19-272 provides that a court may assess attorney fees against an attorney or a party that brings an action or claim "without substantial justification." Section 12-19-271(1) defines an action "without substantial justification" as an action that is "frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation as determined by the court." The trial court, in order to award attorney fees, must make specific findings that the action was brought "without substantial justification." Pacific Enters. Oil Co. v. Howell Petroleum Corp., 614 So.2d 409 (Ala.1993).
The trial court stated that the putative father's contest to the adoption was made without "substantial justification." The *844 court also stated that actions of the putative father and his attorneys "unnecessarily expanded these proceedings and caused unnecessary delay." The trial court also stated that the putative father's attorneys and his parents illegally publicized the adoption contest as a means of subjecting the court to public pressure.
As one could infer from my discussion and resolution of the conflicts between the Putative Father Registry Act and the Alabama Adoption Code, I would necessarily conclude that the putative father's actions were brought with substantial justification and did not unnecessarily delay the proceedings. In addition, our supreme court has stated:
"Also, we conclude that the legislature had no intention to chill attorney creativity in making good faith arguments for changes in the law. Trial courts should be exceedingly careful in making a `without substantial justification' finding, so as not to discourage attorneys from creatively arguing for change in the law based on rational, good faith argument."
Pacific Enters. Oil Co., 614 So.2d at 418. Therefore, I would reverse the sanctions imposed on P.D. and S.D.H.
NOTES
[1] In fact, since the birth, C.B. has spent the night at R.E.L. and C.A.L.'s home to visit the child.
[2] On March 19, 1999, the Disciplinary Commission of the Alabama State Bar cleared R.E.L. of any unethical conduct and dismissed the grievance.
[*] Note from the reporter of decisions: On April 27, 2001, the Alabama Supreme Court withdrew its November 17, 2000, opinion and substituted another one. The opinion substituted on April 27, 2001, remanded the case for the trial court to determine the proper custody of the child.
[3] S.C.W. argues that he timely challenged the constitutionality of the Putative Father Registry Act, § 26-10C-1, in his opposition to the motion for summary judgment. In support of this contention, S.C.W. cites pages 283 and 285 of the record. S.C.W. stated in his filing opposing the summary-judgment motion (C.R. 283), that no court "could determine whether the putative father registry statute as applied, would result in an unconstitutional deprivation of [S.C.W.] and [the child]'s liberty interest without first conducting a full hearing on the issue of the parental relationship existing between the father and child." In a separate argument in that same filing (C.R. 284-85), S.C.W. argues that R.E.L. and C.A.L. mischaracterized the holding of Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and that Lehr does not apply in a case where the father alleges that he has established a relationship with the child. This was insufficient to challenge the constitutionality of § 26-10C-1.